IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SALVEX, INC., | § | |
| | § | |
| Plaintiff, | § | CIVIL ACTION NO: 4-18-cv-01175 |
| | § | |
| v. | § | JURY |
| | § | |
| TRANSFAIR NORTH AMERICA INTERNATIONAL | § | |
| FREIGHT SERVICES, LLC AND TRANSGROUP | § | |
| EXPRESS, INC., | § | |
| | § | |
| Defendants. | § | |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**Table of Contents**

I.     NATURE AND STAGE OF PROCEEDING.................................................................1

II.    ISSUES TO BE RULED UPON................................................................................1

III.   SUMMARY OF ARGUMENT.................................................................................2

IV.    FACTUAL BACKGROUND ....................................................................................3

      A.     TransProject LLC and Defendants are Separate Entities.....................................3

          1.  Transfair North America International Freight Services, LLC. ....................3

          2.  TransGroup Express, Inc. and Trangroup Express, LLC.............................3

          3.  TransProject, LLC. ............................................................................4

      B.     The Transgroup network............................................................................4

          1.  Transgroup Express and Transfair's services to independent
             shipping companies.............................................................................4

          2.  Independent operation under the TSAs. ..................................................7

      C.     Spinning Star Energy and the demise of TransProject.....................................7

      D.     Sale of the turbines and the Violet Rose judgment. .........................................9

V.    ARGUMENTS AND AUTHORITIES .........................................................................11

      A.     Summary judgment standard.......................................................................11

      B.     Defendants are entitled to summary judgment on Salvex's claim for
          fraudulent transfer...................................................................................11

          1.  Salvex has not identified any specific allegedly fraudulent
             transfers. ....................................................................................... 12

          2.  Salvex cannot establish a material question of fact on actual
             intent............................................................................................. 13

          3.  Defendants' receipt of any transfers were made in good faith
             and for reasonably equivalent value, which completely bars
             Plaintiff's claim. ............................................................................. 13

4. Salvex cannot show that TransProject became insolvent as a result of any transfer or that TransProject was insolvent at the time of any challenged transfer. ................................................................ 14

C.      Defendants are entitled to summary judgment on Salvex's conspiracy claim. .......................................................................................... 15

D.      Defendants are entitled to summary judgment on Salvex's alter ego and veil piercing theories of liability. .................................................. 17

1.  Plaintiff's alter ego claims fail because neither Transgroup Express nor Transfair are members of TransProject. .............................. 18

2   Salvex would have to "pierce the veil" multiple times to hold Defendants liable for TransProject's debts .................................... 18

3.  Regardless of lack of ownership, Salvex cannot support a  cause of action for alter ego. ..................................................................... 19

a.      There is no evidence to support a finding that either Defendant is the alter ego of TransProject. .................................. 19

b.      Salvex can produce no evidence of actual fraud on the part of either Defendant. ............................................................. 22

E.      Salvex cannot support its allegation of a joint business enterprise. ............... 23

VI.   CONCLUSION ............................................................................................ 25

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Blount v. Bordens, Inc.,*
910 S.W.2d 931 (Tex. 1995) ............................................................................................. 23

*Bollore S.A. v. Import Warehouse, Inc.,*
448 F.3d 317 (5th Cir. 2006) ........................................................................................... 18

*Castleberry v. Branscum,*
721 S.W.2d 270 (Tex. 1986) ............................................................................................ 20

*Doyle v. Kontemporary Builders, Inc.,*
370 S.W.3d 448 (Tex. App.—Dallas 2012, pet. denied) ................................................ 12

*First United Pentecostal Church of Beaumont v. Parker,*
514 S.W.2d 214 (Tex. 2017). Civil ............................................................................. 15, 16

*Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.,*
960 S.W.2d 41 (Tex. 1998) ............................................................................................... 16

*Matter of Galaz,*
850 F.3d 800 (5th Cir. 2017) ........................................................................................... 12

*In re HDD Rotary Sales, LLC,*
499 B.R. 542 (Bankr. S.D. Tex. 2013) ............................................................................ 15

*Janvey v. Golf Channel, Inc.,*
487 S.W.3d 560 (Tex. 2016) ............................................................................................ 14

*Medlin v. Palmer,*
874 F.2d 1085 (5th Cir. 1989) ............................................................................................ 2

*O'Sullivan v. Countrywide Home Loans, Inc.,*
319 F.3d 732 (5th Cir. 2003) .............................................................................................. 2

*Penhollow Custom Homes, LLC v. Kim,*
320 S.W.3d 366 (Tex. App.—El Paso 2010, no pet.) ..................................................... 20

*Permian Petroleum Co. v. Petroleos Mexicanos,*
934 F.2d 635 (1991) ......................................................................................................... 18

*In re Roblin Indus. Inc.,*
    78 F.3d 30 (2d Cir. 1996) ............................................................................................. 15

*SSP Partners v. Gladstrong Invs. (USA) Corp.,*
    275 S.W.3d 444 (Tex. 2008) ................................................................................ 17, 20, 22

*In re Technicool Sys., Inc.,*
    No. 15-34435, 2018 WL 920013 (Bankr. S.D. Tex. Feb. 14, 2018) ("The ........................... 18

*Tilton v. Marshall,*
    925 S.W.2d 672 (Tex. 1996) ......................................................................................... 16

*Tryco Enters., Inc. v. Robinson,*
    390 S.W.3d 497 (Tex. App.—Houston [1st Dist.] 2012, pet. dism'd) ............................... 20

*U.S. KingKing, LLC v. Precision Energy Servs., Inc.,*
    555 S.W.3d 200 (Tex. App.—Houston [1st Dist.] 2018, no pet.) ......................... 19, 20, 22

*Wilson v. Davis,*
    305 S.W.3d 57 (Tex. App.—Houston [1st Dist.] 2009, no pet.) ........................................ 19

*Zahra Spiritual Trust v. United States,*
    910 F.2d 240 (5th Cir. 1990) ......................................................................................... 18

## Statutes

Tex. Bus. Org. Code § 21.223 ............................................................................................. 18

Tex. Bus. Org. Code § 21.223(b) ......................................................................................... 23

Tex. Bus. Org. Code § 101.002(a) ....................................................................................... 18

Tex. Bus. & Com. Code § 24.004 ........................................................................................ 14

Tex. Bus. & Com. Code § 24.005 ........................................................................................ 15

Tex. Bus. & Com. Code §§ 24.005(a)(1), 24.006(a) ............................................................ 12

Tex. Bus. & Com. Code § 24.005(b) .................................................................................... 13

Tex. Bus. & Com. Code § 24.006 ........................................................................................ 15

Tex. Civ. Prac. & Rem. Code Ch. 34 ................................................................................... 16

Texas Business and Commerce Code § 9.610 ........................................................................ 9

Texas Uniform Fraudulent Transfer Act ............................................................................................ 11

TUFTA .................................................................................................................................................... 14

Unif. Fraudulent Transfer Act, 7A pt. II U .................................................................................... 14

**Other Authorities**

Fed. R. Civ. P. 56 ................................................................................................................................. 1

Fed. R. Civ. P. 56(c) ........................................................................................................................ 11

Defendants Transfair North America International Freight Services, LLC and Transgroup Express, Inc. file this Motion for Summary Judgment and would show the Court as follows:

## I.    NATURE AND STAGE OF PROCEEDING

Original Plaintiff Violet Rose Holdings, Ltd. ("Violet Rose") obtained a judgment against TransProject, LLC, a company that is contractually related to Defendants. When TransProject was unable to pay the judgment, Violet Rose brought this action against the Defendants. The action was filed in state court in March 2018, and removed to this court on the basis of diversity jurisdiction. (Dkt. 1). By Order dated February 22, 2019, Salvex, Inc. substituted in as Plaintiff. (Dkt. 19).

Plaintiff's Amended Complaint sets out causes of action for fraudulent transfer, conspiracy, alter ego/piercing the corporate veil, and joint business enterprise. As set out below, Plaintiff cannot support any of the causes of action. Defendants, therefore, move for judgment as a matter of law under Fed. R. Civ. P. 56.

## II.    ISSUES TO BE RULED UPON

1.      Are Defendants entitled to summary judgment on Plaintiff's fraudulent transfer claims because all transfers from TransProject to Defendants were made for reasonably equivalent value pursuant to a pre-existing contract?

2.      Are Defendants entitled to summary judgment on Plaintiff's conspiracy claim because Plaintiff cannot establish that Defendants engaged in an unlawful act?

3.      Are Defendants entitled to summary judgment on Plaintiff's alter ego/veil piercing theories because neither Defendant owns shares or units in TransProject?

4.      Are Defendants entitled to summary judgment on Plaintiff's alter ego/veil piercing theories because Defendants and TransProject are separate entities and did not engage in any conduct that would justify disregarding their separate corporate forms?

5.      Are Defendants entitled to summary judgment on Plaintiff's joint business enterprise theory because there is no material question of fact that would support a finding of a common purpose, community of pecuniary interest and equal right of control among TransProject and the Defendants?

The Court's decision on summary judgment is reviewed de novo. *Medlin v. Palmer*, 874 F.2d 1085, 1089 (5th Cir. 1989). The court's decision to pierce the corporate veil is reviewed for clear error. *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 737 (5th Cir. 2003).

**III.      SUMMARY OF ARGUMENT**

Plaintiff's claims are all deficient. Plaintiff's fraudulent transfer claim fails as a matter of law because was no transfer from TransProject to either Defendant for less than reasonable equivalent value, and there is no evidence of intent to defraud. The only money exchanged between the entities consisted of the fees and costs for which TransProject was responsible under its contracts with Defendants. Plaintiff cannot sustain its conspiracy cause of action because TransProject's failure to pay a creditor does not constitute an unlawful act. Plaintiff's alter ego/veil piercing claim must be dismissed as well because neither Defendant owns an interest in TransProject. Further, there is no evidence of alter ego or actual fraud necessary to pierce the corporate veil under Texas law. Finally, Defendants did not operate as a joint business enterprise and Plaintiff has no evidence to the contrary.

## IV.     FACTUAL BACKGROUND

### A.     TransProject, LLC and Defendants are Separate Entities.

#### 1.     Transfair North America International Freight Services, LLC.

Transfair North America International Freight Services, Inc. was formed in Washington State in 1986. Declaration of Angie Santillan, ¶ 2. Greg Vernoy and Christine Dearden were shareholders since inception of the company and its only shareholders since 2007. *Id.* In September 2016, they sold their shares to an equity fund. *Id.* Contemporaneous with that sale, the new owner converted the corporation to a limited liability company. *Id.* TransGroup Global, Inc. now holds 100% of the membership units of Transfair North America International Freight Services, LLC (hereafter, "Transfair"). *Id.* Vernoy and Dearden own minority interests in TransGroup Global, Inc. *Id.* Vernoy currently serves as Chief Executive Officer of Transfair. *Id.*

#### 2.     TransGroup Express, Inc. and Trangroup Express, LLC.

Transgroup Express, Inc. was formed in Washington State in 1989. *Id.*, at ¶ 3. The three founders and shareholders were Greg Vernoy, Christine Dearden and Ron Lee. *Id.* In September 2016, those three sold their shares to the same fund that acquired Transfair. *Id.* Consistent with the Transfair acquisition, the new owner converted Transgroup Express, Inc. to Transgroup Express, LLC. *Id.* TransGroup Global, Inc. now holds 100% of Transgroup Express, LLC (hereafter, "Transgroup Express"). *Id.* Vernoy, Dearden and Lee own minority interests in TransGroup Global, Inc. and Lee currently serves as President of Transgroup Express, LLC. *Id.*

          **3.**        **TransProject, LLC.**

TransProject, LLC was formed in Texas in 2009. Santillan Decl., ¶ 4. Its members were Greg Vernoy (49%), Christine Dearden (21%), Susan St. Germain (25%), and Angie Santillan (5%). *Id.* St. Germain was TransProject's Executive Director of Projects. *Id.* TransProject was dissolved in 2017. *Id.*

        **B.**        **The Transgroup network.**

Transgroup Express and Transfair both operate under the trade name "Transgroup Worldwide Logistics," which was recently modified to "Transgroup Global Logistics." Santillan Decl., ¶ 5. Transgroup Express and Transfair individually or jointly own a number of other trade names and service marks including but not limited to Trans-Show, TransAviation, TransFilm, TransVine, TransMarine, TransGolf, TransExhibit and TransWear. *Id.* These trade names and service marks are registered in the U.S. and/or foreign countries, and are licensed to companies who contract with Transgroup Express and/or Transfair to use in marketing their services to particular regions or industries. *Id.*

          **1.**        **Transgroup Express and Transfair's services to independent shipping companies.**

Transgroup Express and Transfair both provide back-office services, primarily accounting and billing, to a network of shipping companies. Santillan Decl., ¶ 6. The difference is that Transgroup Express provides these services to shipping companies who handle domestic freight, while Transfair provides the services to shipping companies who handle international freight. *Id.*

It is important to note that neither TransGroup Express nor Transfair are in the business of providing shipping services directly to consumers. Rather, they provide services to shipping companies. Santillan Decl., ¶ 7. Those services include accounting, which includes billing and

collecting; information technology and software solutions; logistics expertise; regulatory compliance assistance; cargo claims coordination; and experience with vendors. *Id.* For international freight, Transfair holds a U.S. Customs license and other licenses and has contacts with a network of foreign agents to accommodate needs in other countries. *Id.* Transgroup Express and Transfair can negotiate volume rates for its network of companies and provide name recognition, which the stations can leverage to secure business. *Id.*

The shipping companies within the Trangroup Express and Transfair network are informally referred to as "stations," and there are approximately 90 stations on five continents around the world. Santillan Decl., ¶ 8. Some stations are owned in whole or in part by Transgroup Express and/or Transfair, some are owned in whole or part by one of more of the original owners of Transgroup Express or Transfair, and others are owned by unrelated third parties. *Id.* Regardless of its ownership structure, each station is an independent company. *Id.*

When U.S. stations contract with Transgroup Express or Transfair, they sign a Transportation Services Agreement ("TSA"). Santillan Decl., ¶ 9. TransProject was one of the stations that contracted with Transfair and Transgroup Express. Santillan Decl., ¶ 9. TransProject signed a TSA with Transfair and a TSA with Transgroup Express in April 2009. *Id., exhs. A, B.*

TransProject, like every other station, had its own financing and profits and losses and did not share or comingle its funds with Tranfair or Transgroup Express. Santillan Decl., ¶ 10. TransProject leased its own office and warehouse space. *Id.*, exh. C. It also bought or leased its own forklifts and warehouse equipment, as well as its computers and office furniture. *Id.* TransProject did not share employees or staff with either Transgroup Express or Transfair; rather, it had its own employees and

did its own hiring, firing and training. *Id.,* exh. D. TransProject maintained its own bank accounts, kept its own books and records, paid its own taxes, and filed its own tax returns. *Id.*, ¶¶ 11-13 and exhs. E, F, G. TransProject had its own marketing, and otherwise operated autonomously. *Id.*, ¶ 13 and exh. H. While Transgroup Express and Transfair stored financial and shipping data on their servers and hosted email traffic for TransProject and all other stations, TransProject had access only to its information and not to information pertaining to other stations. *Id.*, ¶ 14. Neither Transgroup Express nor Transfair controlled how TransProject operated, or how and with whom TransProject conducted business. *Id.* Neither Transgroup Express nor Transfair provided sales leads, or maintained customer lists for TransProject. *Id.* Although Transgroup Express and Transfair have relationships with vendors and international shipping agents, TransProject was not required to use them. *Id.* Similarly, Transgroup Express and Transfair did not dictate the rates TransProject charged. *Id.* Although contractually entitled to use Transgroup's service marks, TransProject was required to demark its separate business identity, and respect Transgroup Express's right to protect its brand, e.g. the appearance of any website, use of Transfair's or Transgroup Express's trade names and marks, and format of business cards. *Id.*, exh. A at ¶ 4.2 and exh. B at ¶ 4.2. Finally, TransProject expressly agreed that it would not operate in, or represent itself as operating in, a partnership or joint venture with Transfair or Transgroup Express. *Id.*, exh. A at ¶ 7.2 and exh. B at ¶ 7.2. Conversely, neither Transfair nor Transgroup Express was entitled act on behalf of TransProject. *Id.* Once the TSA terminated, TransProject was entitled to maintain its separate business and continue operating its business under its own name. *Id.*, exh. A at ¶ 11.2 and exh. B at ¶ 11.2.

### 2. Independent operation under the TSAs.

When TransProject, or any other station, moves freight for a customer, the contractual relationship with Transgroup Express and/or Transfair works as follows:

The station – acting under the TransGroup Global Logistics trade name – is hired by a customer to move freight from point A to point B via the mode (air, sea, or ground) chosen by the customer. Santillan Decl., ¶ 15. If it is an international movement, the station may also contract with a customs broker, stevedore or other vendor. *Id.* The freight is moved on a Transgroup International bill of lading, and Transfair pays the carrier, brokers and other vendors necessary to move the freight. *Id.* The customer is then billed by the station and remits payment to Transfair. *Id.* If the customer does not pay, Transfair works to collect the amounts due on behalf of the station. *Id.* Any collection costs are charged to the station. *Id.* The vendor costs and revenue are captured in daily "recaps" prepared by the station and Transfair pays the station the net revenue based on the "recapped" costs. *Id.*, ¶ 16, exh. I. When the customer pays, Transfair is reimbursed from that revenue for the carrier and vendor costs it advanced, and collects the fee due for its services. *Id.*, ¶ 15. Net revenue is paid to the station weekly. *Id.* Transgroup Express operates the same way for stations performing domestic services. *Id.*

### C. Spinning Star Energy and the demise of TransProject.

As its name implies, TransProject was created to penetrate the niche market of large, complicated movements of industrial equipment. Santillan Decl., ¶ 17. The idea was to use its status as a Minority and Woman Owned Business to penetrate a largely male-dominated sector of industry. *Id.* St. Germain had a strong background in that sector and, as Executive Director of Projects, was in charge of business development and operations for TransProject. *Id.*

After some early success, TransProject became entangled in a project with a crooked company named Spinning Star Energy, LLC ("Spinning Star"). That project effectively put TransProject out of business. Santillan Decl., ¶ 18.

Spinning Star was supposed to be a billion dollar wind energy project in East Texas, featuring the first joint venture between a Chinese conglomerate and a U.S. company. Santillan Decl., ¶ 19. It began in the depth of the 2008 recession so its promise of constructing plants and providing manufacturing jobs was exciting. *Id.* Senator Harry Reid hosted the Chinese officials in hopes of securing one of the plants for Nevada. *Id.*, exh. J. General Electric secured a nearly half billion dollar contract to build the gearboxes. *Id.* And TransProject was solicited to be the logistics provider. *Id.* The work promised to TransProject included importing 300 massive wind turbines from China and then moving them on retrofitted trucks from the Port of Houston to the project site. In September 2011, TransProject signed a contract to offload the first 12 turbines shipped from China and store them in a foreign trade zone in the Port of Houston. *Id., exh.* K.

After shipping the first 12 turbines, Spinning Star never delivered another. Santillan Decl., ¶ 20. Spinning Star's CEO lied to TransProject, representing that funding for the project was imminent, and convinced TransProject to advance the cost of storing the 12 turbines until its financing from China came through. *Id.* Believing Spinning Star's promise, TransProject signed a contract with Cooper T. Smith Stevedoring, agreeing to pay more than $14,000 per month to store Spinning Star's 12 wind turbines in a foreign trade zone in the Port of Houston. *Id.*

Unbeknownst to TransProject, the Spinning Star Energy project was a massive fraud. *Id.* Hundreds of millions of dollars in Chinese investment went missing, causing Spinning Star's U.S.

partner to bail. Bay Decl., A. General Electric was awarded a $400 million judgment, and an arrest warrant was issued by the Philippines for the head of the Chinese conglomerate. *Id.,* exh. B, C.

The decision to pay storage costs on behalf of Spinning Star ruined TransProject. Santillan Decl., ¶ 21. Spinning Star was broke, there was no Chinese financing coming, and it never reimbursed TransProject for the storage costs. *Id.* TransProject could not afford to continue to pay the $14,000 monthly storage costs, but when TransProject failed to pay, Cooper T. Smith Stevedoring held hostage freight TransProject was shipping for other customers. *Id.*

TransProject's entire business was in jeopardy: it could not continue to pay $14,000 per month to store Spinning Star's turbines, and it could not stop paying the storage costs without jeopardizing other freight it was moving for other customers through Cooper T. Smith Stevedoring's foreign trade zone. Santillan Decl., ¶ 22. Further, TransProject did not have sufficient cash reserves to continue funding the storage costs for the period of time it would take to commence a lawsuit against Spinning Star, obtain a judgment, and then collect that judgment. *Id.* So TransProject decided its only option was to exercise its contractual lien rights and try to quickly sell the turbines under Texas Business and Commerce Code § 9.610. *Id.*

### C.    Sale of the turbines and the Violet Rose judgment.

In October 2013, TransProject retained Salvex to auction the turbines. Santillan Decl., ¶ 23. TransProject gave Spinning Star notice of the sale, but Salvex controlled all other aspects of the sale, including advertising and bidding procedures. *Id.*

On December 6, 2013, Salvex informed TransProject that the winning bid was $720,000. Santillan Decl., ¶ 24, exh. M. Salvex did not disclose the identity of the buyer. *Id.* TransProject later

learned that the winning bidder was a company called Accent Communications out of Canada which, due to lack of funds, assigned its winning bid to another Canadian company, Violet Rose Holdings, Ltd. Bay Decl., exh. D and E (Dola depo) at 37:18-38:19. Violet Rose was lured into buying the turbines by the prospect of doubling its money by selling to yet another Canadian company, Green Hygienics. *Id.,* exh. E (Dola depo) at 39:1-19.

The sale closed and Salvex paid $720,000 – the amount it represented to TransProject was the winning bid – to TransProject. Santillan Decl., ¶ 25. TransProject applied $317,828.75 to satisfy the outstanding balance owed by Spinning Star. *Id.*

Spinning Star then sued TransProject for selling its turbines, claiming $20 million in damages. Santillan Decl., ¶ 25. Meanwhile, Violet Rose's scheme to double its money evaporated, and it no longer wanted the turbines. *Id.* So it voluntarily joined the lawsuit seeking a return of its purchase price. *Id.* Other entities who were owed money from Spinning Star claimed an interest in the excess sale proceeds as well. *Id.* Because of the competing claims, TransProject retained the excess sale proceeds pending direction from the court. *Id.*

After the Spinning Star lawsuit was filed, TransProject learned that the winning bid for the turbines was $1.1 million, not $720,000. Santillan Decl., ¶ 26, exh. N. Salvex had orchestrated a $400,000 commission for selling the turbines, and concealed that commission from TransProject. *Id.* This was important because Violet Rose sued TransProject for return of not only the $720,000 it received from the sale of the turbines but also Salvex's secret $400,000 commission. *Id.*

In the Spinning Star lawsuit, Violet Rose obtained a $1.1 million judgment against TransProject. Santillan Decl., ¶ 27. In addition to this judgment, TransProject accrued other debt while the Spinning

Star lawsuit was pending. *Id.* Since Violet Rose never took possession of the turbines after it purchased them, Cooper T. Smith Stevedoring continued charging TransProject monthly storage costs. *Id.* Between the mounting costs owed to Cooper T. Smith Stevedoring, legal fees for the Spinning Star litigation, some uncollectable accounts receivable, and then the judgment to Violet Rose, TransProject's debt became too large to manage. *Id.* TransProject transferred to Violet Rose the excess sale proceeds (approximately $400,000) it had been holding since the auction sale. *Id.* TransProject was unable, however, to satisfy the remainder of the judgment. *Id.* Facing aggressive collection efforts from Violet Rose, TransProject was forced to close its business. *Id.,* exh. O.

Subsequently, Violet Rose obtained a judgment against Salvex. *Id.,* ¶ 29. In post-judgment dealings, Violet Rose assigned this cause of action to Salvex, which substituted in for as plaintiff. (Dkt. 19). Salvex has now taken to social media, disparaging Transgroup Express and Transfair in an attempt to extort payment from them. Santillan Decl., ¶ 29.

## IV.   ARGUMENTS AND AUTHORITIES

### A.   Summary judgment standard.

Summary judgment is proper when the summary judgment evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

### B.   Defendants are entitled to summary judgment on Salvex's claim for fraudulent transfer.

In support of its fraudulent transfer cause of action under the Texas Uniform Fraudulent Transfer Act ("TUFTA"), Salvex alleges that "[t]he Transgroup Defendants received money and other

11

assets from Transproject . . . with actual intent to hinder, delay, or defraud Violet Rose, or without receiving a reasonably equivalent value in exchange." Dkt. 10, Am. Compl., ¶ 15.

A transfer is fraudulent as to present creditors if (1) "the debtor made the transfer . . . with actual intent to hinder, delay, or defraud any creditor of the debtor," or (2) the debtor made the transfer "without receiving a reasonably equivalent value in exchange for the transfer," and the debtor was insolvent at the time the transfer was made or became insolvent shortly thereafter. Tex. Bus. & Com. Code §§ 24.005(a)(1), 24.006(a). Salvex bears the burden of proving the fraudulent transfer by a preponderance of the evidence. *Matter of Galaz*, 850 F.3d 800, 804 (5th Cir. 2017). Each purportedly fraudulent transfer must be analyzed individually and Plaintiff must come forward with evidence raising a material question of fact as to actual intent or lack of reasonably equivalent value with respect to every transfer it seeks to claw back. *Doyle v. Kontemporary Builders, Inc.*, 370 S.W.3d 448, 453 (Tex. App.—Dallas 2012, pet. denied) ("It is the creditor's burden to offer evidence addressing the elements of fraudulent transfer as to each transfer."). Salvex cannot meet its burden on several elements.

> **1.**    **Salvex has not identified any specific allegedly fraudulent transfers.**

There was no transfer from TransProject to either Transgroup Express or Transfair of the proceeds from the turbine sale. Violet Rose paid $1.1 million to Salvex for the turbines. Salvex then paid $720,000 to TransProject. From that $720,000, $317,828.75 was applied to satisfy the outstanding amount owed TransProject by Spinning Star and the remaining funds were paid to Violet Rose.

Defendants have provided Plaintiff with documents that reflect each and every transaction since 2014 between TransProject and Transgroup Express and between TransProject and Transfair.

Santillan Decl., ¶ 16. To date, Plaintiff has failed to identify a single specific transfer that was fraudulently made. Nor could it. There was never a transfer from TransProject for less than a reasonably equivalent value during its entire history with Transgroup Express and Transfair. *Id.* The only money exchanged between those entities was the payment of fees owed by TransProject under its TSAs with Transgroup Express and Transfair. *Id.*

> **2.     Salvex cannot establish a material question of fact on actual intent.**

Salvex cannot show that any transfers from TransProject to either Transgroup Express or Transfair were made with actual intent to hinder, delay, or defraud its creditors. Recognizing that direct evidence of fraudulent intent is difficult to find, the Texas legislature has adopted 11 non-exclusive "badges of fraud" that may be considered to determine whether a transfer was made with actual intent to defraud. Tex. Bus. & Com. Code § 24.005(b). The only transfers from TransProject to Transgroup Express or Transfair were made in the ordinary course of business pursuant to the terms of its pre-existing TSA, they do not exhibit any of the badges of fraud and cannot support the necessary element of actual intent. Santillan Decl., ¶ 16.

> **3.     Defendants' receipt of any transfers were made in good faith and for reasonably equivalent value, which completely bars Plaintiff's claim.**

Even if Plaintiff could produce evidence of an intent to defraud—which it cannot—the fact that Transgroup Express and Transfair received transfers from TransProject in good faith and for reasonably equivalent value under the TSAs completely bars Plaintiff's claim. "In fact, if 'a reasonable equivalent has been given in good faith for a transfer or obligation [the transferee has] a *complete defense* although the debtor is shown to have intended to hinder, delay, or defraud creditors.'" *Janvey*

13

*v. Golf Channel, Inc.*, 487 S.W.3d 560, 573 (Tex. 2016) (quoting Unif. Fraudulent Transfer Act, 7A pt. II U.L.A. 6 (2006)).

TUFTA defines "value" and "reasonably equivalent value". Tex. Bus. & Com. Code § 24.004. Importantly, both the statute and the Texas Supreme Court's interpretation thereof confirm that "enforceable promises made or performed in the ordinary course of the promisor's business would constitute value under TUFTA." *Janvey*, 487 S.W.3d at 574; *see also id.* at 576 ("the definition of value expressly includes a transfer made to satisfy an antecedent debt, even though satisfaction of the debt would deplete estate assets that might otherwise have been available for the benefit of creditors."). "The reasonably equivalent value requirement in section 24.009(a) is thus satisfied if a transferee performs objectively valuable services or transfers goods in an arm's-length transaction at market-value rates." *Id.* at 577. There have been no allegations that Transgroup Express or Transfair failed to perform its contractual obligations under the TSAs or that the TSA terms were not negotiated in an arm's-length transaction for market-value rates; accordingly, TransProject's contractual payments thereunder were received by Defendants in good faith and for reasonably equivalent value for those services. Santillan Decl., ¶ 16.

> **4.      Salvex cannot show that TransProject became insolvent as a result of any transfer or that TransProject was insolvent at the time of any challenged transfer.**

And even if Salvex could show that transfers to Transgroup Express and Transfair were made without reasonably equivalent value of services—which it cannot—Salvex cannot prove TransProject became insolvent as a result of any purported transfer to Transgroup Express or Transfair or was

insolvent at the time of any yet-unidentified transfer. Tex. Bus. & Com. Code § 24.006 (requiring that debtor be insolvent at time of transfer or because of transfer).

Unless a debtor admits insolvency, the question of whether a debtor was insolvent at the time of a particular transfer requires expert analysis of the debtors' financial condition. *See, e.g., In re HDD Rotary Sales, LLC*, 499 B.R. 542, 551 (Bankr. S.D. Tex. 2013) (citing *In re Roblin Indus. Inc.*, 78 F.3d 30, 35 (2d Cir. 1996) (insolvency determinations should be based on seasonable appraisals or expert testimony)). Plaintiff did not disclose an expert on this issue by the January 25, 2019 deadline. (Dkt. 11). Without an expert (or any other evidence), Plaintiff cannot show a material question of fact on this necessary element of its fraudulent transfer claim.

Since Salvex cannot meet its burden to show that any transfer was made with the intent to defraud or without receiving a reasonably equivalent value, its claim for fraudulent transfer fails as a matter of law. Tex. Bus. & Com. Code § 24.005.

### C. Defendants are entitled to summary judgment on Salvex's conspiracy claim.

Salvex alleges that TransProject conspired with Transgroup Express and Transfair to accomplish the unlawful act of not paying Violet Rose's judgment. This claim fails as a matter of law because failure to pay a debt is not unlawful.

To prove civil conspiracy, a plaintiff must establish five elements: "(1) a combination of two or more persons; (2) the persons seek to accomplish an object or course of action; (3) the persons reach a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts are taken in pursuance of the object or course of action; and (5) damages occur as a proximate result." *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 222 (Tex. 2017). Civil conspiracy

also requires proof of specific intent: the parties must "agree to accomplish something unlawful or to accomplish something lawful by unlawful means." *Id.* A civil conspiracy claim is a derivative claim and requires the commission of an underlying tort. *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996).

Salvex has identified only one underlying tort on which its conspiracy claim could be premised: fraudulent transfer. But as explained above, because Salvex's fraudulent transfer claim fails as a matter of law, so too must its derivative conspiracy claim. To the extent that Salvex's claim is premised on another unidentified unlawful act by the alleged conspirators, it must be TransProject's failure to pay the Violet Rose judgment. While TransProject's inability to pay the Violet Rose judgment is unfortunate, it is not independently unlawful. *Cf. Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998) (mere failure to perform a contract is not evidence of fraud, as opposed to promises to perform with the intent not to do so). Indeed, Texas acknowledges that a judgment-debtor might not pay the judgment and provides procedures for allowing judgment-creditors to execute on the debtors' property to satisfy their judgment. *See generally* Tex. Civ. Prac. & Rem. Code Ch. 34. Importantly, none of these statutes make it unlawful for judgment-debtor to be unable to satisfy a judgment. In the absence of an unlawful act or purpose, Salvex's conspiracy claim fails as a matter of law.

Salvex cannot offer evidence to support other required elements of a conspiracy claim either. Whatever Plaintiff believes, Transgroup Express and Transfair took no part in any decisions by TransProject regarding payment of the Violet Rose judgment. Santillan Decl., ¶ 28. Nor would they have any reason to given that TransProject was a separate company; its debts were its own and in no way attributable to either Defendant. *Id.*, ¶¶ 8–14. TransProject was an independent contractor that

16

pursued its business objectives independent of any interference or influence from Transgroup Express or Transfair. *Id.* Plaintiff cannot show that there is a material question of fact as to the existence of either an agreed unlawful object or course of action between TransProject and Defendants.

Since Salvex cannot prove the elements of a conspiracy, its claim fails as a matter of law and Defendants are entitled to summary judgment on Plaintiff's conspiracy claim.

### D.   Defendants are entitled to summary judgment on Salvex's alter ego and veil piercing theories of liability.

Texas strongly adheres to the policy of recognizing separate corporate identities, including between affiliated corporations. "Creation of affiliated corporations to limit liability while pursuing common goals lies firmly within the law and is commonplace." *SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 455 (Tex. 2008). Indeed, it is a "bedrock principle of corporate law" that a corporation may be formed for the legitimate aim of limiting individual liability. *Id.* Consistent with that maxim, the Texas Legislature has set forth the limited circumstances under which the corporate fiction may be disregarded and individual shareholders or members held liable for a corporation's contractual obligations:

> (a) A holder of shares, an owner of any beneficial interest in shares, or a subscriber for shares whose subscription has been accepted, or any affiliate of such a holder, owner, or subscriber or of the corporation, may not be held liable to the corporation or its obligees with respect to: . . .
>
> > (2) any contractual obligation of the corporation or any matter relating to or arising from the obligation on the basis that the holder, beneficial owner, subscriber, or affiliate is or was the alter ego of the corporation or on the basis of actual or constructive fraud, a sham to perpetrate a fraud, or other similar theory; . . .
>
> (b) Subsection (a)(2) does not prevent or limit the liability of a holder, beneficial owner, subscriber, or affiliate if the obligee demonstrates that the holder, beneficial owner, subscriber, or affiliate caused the corporation to be used for the purpose of perpetrating and did perpetrate

an actual fraud on the obligee primarily for the direct personal benefit of the holder, beneficial owner, subscriber, or affiliate.

Tex. Bus. Org. Code § 21.223. These same rules apply to limited liability companies. Tex. Bus. Org. Code § 101.002(a).

### 1. Plaintiff's alter ego claims fail because neither Transgroup Express nor Transfair are members of TransProject.

"Texas courts will not apply the alter ego doctrine to directly or reversely pierce the corporate veil unless one of the 'alter egos' owns stock in the other." *Permian Petroleum Co. v. Petroleos Mexicanos*, 934 F.2d 635 (1991)(citing *Zahra Spiritual Trust v. United States*, 910 F.2d 240, 245–46 (5th Cir. 1990)); *see also Bollore S.A. v. Import Warehouse, Inc*., 448 F.3d 317, 325 (5th Cir. 2006) ("The great weight of Texas precedent indicates that, for the alter ego doctrine to apply against an individual under this test, the individual must own stock in the corporation."); *In re Technicool Sys., Inc*., No. 15-34435, 2018 WL 920013, at *4 (Bankr. S.D. Tex. Feb. 14, 2018) ("The Court has thoroughly reviewed [*Bollore*], and the holding is unambiguous. Veil piercing is a Texas cause of action; under Texas law, the veil may only be pierced against an owner."). Neither Transgroup Express nor Transfair was a member of TransProject or otherwise owned an interest in TransProject. Santillan Decl., ¶¶ 2–4. Thus, both are immune to Salvex's alter ego/veil piercing claim.

### 2. Salvex would have to "pierce the veil" multiple times to hold Defendants liable for TransProject's debts.

In order to get around the ownership limitation, to hold either Transgroup Express or Transfair liable for TransProject's conduct, Plaintiff must pierce the corporate veil multiple times: first, to TransProject's members and second, under "reverse" veil-piercing of those members to another non-party entity, and again, from that entity to the Defendants.

TransProject had four members: Greg Vernoy, Christine Dearden, Angie Santillan and Susan St. Germain. Santillan Decl., ¶ 4. Vernoy and Dearden own minority interests in non-party TransGroup Global, Inc. which currently holds 100% of the membership units of Transfair and Transgroup Express. *Id.*, ¶¶ 2-3. Critically, Plaintiff has not alleged that veil piercing is appropriate in these instances, simply skipping ahead between TransProject and Transfair/Transgroup Express. Dkt. 10 at ¶¶ 17–18. This is insufficient as a matter of law and Plaintiff's alter ego claims should be dismissed.

### 3. Regardless of lack of ownership, Salvex cannot support a cause of action for alter ego.

Even if Salvex's alter ego cause of action could proceed against a non-owner and without the required chain of veil piercing, the claim still fails as a matter of law.

To pierce the corporate veil—and hold a corporation liable under an alter ego theory—a plaintiff must prove "(1) that the entity on which it seeks to impose liability is the alter ego of the debtor, and (2) that the corporate fiction was used for an illegitimate purpose, that is, to perpetrate an actual fraud on the plaintiff for the defendant's direct benefit." *U.S. KingKing, LLC v. Precision Energy Servs., Inc.*, 555 S.W.3d 200, 213–14 (Tex. App.—Houston [1st Dist.] 2018, no pet.). Generally, the corporate form should not be disregarded on an alter ego basis "absent exceptional circumstances." *Wilson v. Davis*, 305 S.W.3d 57, 69 (Tex. App.—Houston [1st Dist.] 2009, no pet.). Here, Salvex can prove neither alter ego nor fraud.

### a. There is no evidence to support a finding that either Defendant is the alter ego of TransProject.

To support a finding of alter ego, a plaintiff must prove that "there is such unity between corporation and individual that the separateness of the corporation has ceased and holding only the

corporation liable would result in injustice." *Tryco Enters., Inc. v. Robinson*, 390 S.W.3d 497, 508 (Tex. App.—Houston [1st Dist.] 2012, pet. dism'd) (quoting *Castleberry v. Branscum*, 721 S.W.2d 270, 272 (Tex. 1986)). In assessing alter ego, a court looks at the "total dealings" of the two corporations, including "the degree to which [property has] been kept separate, the amount of financial interest, ownership, and control [one corporation] maintains over [the other], and whether the corporation has been used for personal purposes." *KingKing*, 555 S.W.3d at 213.

Specifically, when deciding whether corporations are alter egos of one another, a court may assess: (1) whether the entities shared common business names, offices, employees, or accounting; (2) whether one entity paid the others' employees; (3) whether one entity performed services on behalf of the other; (4) "whether one entity made undocumented transfers of funds to the other entity"; (5) whether there is a clear allocation of profits and losses between the two entities; (6) whether there was commingling of funds, or one entity paid the debts of the other; (7) whether one entity represented that it would financially back the other; (8) whether company profits were diverted from one entity to the other; (9) whether there was inadequate capitalization of one entity; and (10) whether there were other failures to keep assets separate. *Id.* at 214 (citing *Tryco Enters.*, 390 S.W.3d at 509; *Penhollow Custom Homes, LLC v. Kim*, 320 S.W.3d 366, 372 (Tex. App.—El Paso 2010, no pet.)). A corporation cannot, however, be jointly liable for the obligations of another "merely because of centralized control, mutual purposes, and shared finances." *SSP Partners*, 275 S.W.3d at 455.

Here, TransProject is entirely separate from Transgroup Express and Transfair. While TransProject operated in the same industry as Transgroup Express and Transfair, the companies served different constituents and had different business purposes. TransProject solicited business from

and provided services to customers with shipping and logistics needs, while Transgroup Express and Transfair provide services to TransProject and other stations under contract. Santillan Decl., ¶¶ 6, 17. TransProject had its own customer list, marketing list and sources of revenue. *Id.*, ¶¶ 10–13. TransProject also leased its own offices and equipment, and hired, trained and paid its own employees. *Id.* It prepared and filed its own tax returns, maintained its own bank accounts, books and records, and prepared its own financial statements. *Id.* TransProject held member meetings and otherwise observed corporate formalities. *Id.*

Neither Transgroup Express nor Transfair owned an interest in TransProject and neither exercised, nor had the right to exercise, any control over TransProject. *Id.*, ¶ 14. Neither Transgroup Express nor Transfair paid TransProject's employees, made or received undocumented transfers from TransProject, or represented to any entity that they would financially back TransProject. *Id.*, ¶¶ 10, 16 and exhs. A, B, ¶ 7.2. No TransProject revenue was transferred to either Transgroup Express or Transfair, except as required by their contracts. *Id.*, ¶ 16. Transgroup Express and Transfair provided daily/weekly "recaps" to TransProject reflecting that day's financial activity such as vendor payments and collections from customers. *Id.* Those recaps, which were produced to Plaintiff, demonstrate a clear accounting of all financial activity between the entities and further prove there was no comingling of funds between TransProject and the other defendants. *Id.* While both Transgroup Express and Transfair provided services to TransProject pursuant to the TSAs, neither performed extra-contractual services on behalf of TransProject. *Id.*, ¶ 7.

Finally, TransProject was adequately funded. It was formed in 2009, and had sufficient capital to operate. It paid its office and equipment leases, paid all its employees and was current with all its

vendors until its fateful decision to conduct business with Spinning Star. Santillan Decl., ¶¶ 18, 28. That led to the decision to sell the turbines, which, in turn, resulted in the judgment in favor of Violet Rose, which TransProject was simply unable to pay. *Id.*, ¶¶ 22, 27.

The only evidence Salvex can point to in support of its claim is the fact that two of TransProject's four members (Vernoy and Dearden) were formerly shareholders of Transgroup Express and Transfair and are now shareholders of the company that owns Transgroup Express and Transfair, and that TransProject contracted to use trade names owned by Transgroup Express and Transfair. Those isolated facts are insufficient to prove alter ego as a matter of law and Defendants are entitled to summary judgment on Plaintiff's alter ego claim.

> **b.     Salvex can produce no evidence of actual fraud on the part of either Defendant.**

In the context of alter ego liability, "actual fraud" means an act involving "dishonesty of purpose or intent to deceive"—a determination that "involves a consideration of whether the entities' use of limited liability was illegitimate." *KingKing*, 555 S.W.3d at 217 (internal quotation and citation omitted). The alter ego factors are "almost entirely irrelevant" to the question of actual fraud. *SSP Partners*, 275 S.W.3d at 455. Instead, to show that there has been "actual fraud," the plaintiff must establish that "the companies used the corporate structure to shield abuse such as 'fraud, evasion of existing obligations, circumvention of statutes, monopolization, criminal conduct, and the like.'" *KingKing*, 555 S.W.3d at 219 (quoting *SSP Partners*, 275 S.W.3d at 455). And the plaintiff must show that said abuse was committed for the "direct personal benefit" of the defendant company. *Id.*; Tex. Bus. Org. Code § 21.223(b).

The evidence establishes—and Salvex can offer no evidence to the contrary—that TransProject engaged in no fraudulent conduct for the benefit of Transfair or Transgroup Express. Likewise there is no evidence of abuse or that either Transgroup Express or Transfair received any "direct personal benefit" as a result of any purported, unspecified abuse. TransProject paid Transfair and Transgroup Express fees owed for services it performed pursuant to the TSAs—these payments were only benefit that either Defendant received from TransProject. Santillan Decl., ¶ 16.

Because Plaintiff cannot prove the required elements to pierce the corporate veil under Texas law, Defendants are entitled to summary judgment on this claim.

### E.    Salvex cannot support its allegation of a joint business enterprise.

Joint business enterprise is a tort concept—not a corporate liability concept. It permits one party to be held liable for the *negligent* acts of its co-venturer "while acting in furtherance of their common undertaking." *See Aluminum Chems. (Bolivia), Inc. v. Bechtel Corp.*, 28 S.W.3d 64, 67 (Tex. App.—Texarkana 2000, no pet.). To establish a joint enterprise, the plaintiff must show: "(1) an agreement among members of the group; (2) a common purpose; (3) a community of pecuniary interest; and (4) an equal right to control the enterprise." *Id.* (citing *Blount v. Bordens, Inc.,* 910 S.W.2d 931, 933 (Tex. 1995)).

Salvex has not alleged any negligent acts by TransProject nor was negligence adjudicated in the litigation in which the Violet Rose judgment was entered. This alone bars Plaintiff's claim.

Even if it could establish negligence, Salvex can prove none of the necessary elements of its claim. Salvex alleges that "the parties entered into an agreement among the members of the group for the common purpose of providing shipping logistics services in the port of the Gulf of Mexico." Dkt.

10, Am. Compl., ¶ 20. The contracts disprove this allegation. TransProject signed a contract to provide logistics services to Spinning Star in the Port of Houston. Santillan Decl., exh. K. Neither Transgroup Express nor Transfair signed that contract. Trangroup Express and Transfair contracted to provide back office services to TransProject for a fee. *Id.,* exhs. A, B. Thus, the parties did not share a common business purpose: TransProject's business was providing logistics services to its customers while Transgroup Express and Transfair's business is providing services to TransProject and other shipping companies.

The defendants do not have a community pecuniary interest either. TransProject's revenue derives from the shipping services it provides to its customers. Santillan Decl., ¶ 15. Transgroup Express and Transfair's revenue comes from the fees it charges to TransProject and other shipping companies. *Id.*, ¶ 6, and exhs. A, B.

Finally, none of the defendants have a right to control the other defendants. TransProject has no right or ability to control either Transgroup Express or Transfair. Conversely, neither Transgroup Express nor Transfair has a right to control TransProject's operations. Santillan Decl., ¶ 14. While Transfair may help its stations collect unpaid accounts receivable, as it did with TransProject's receivable from Spinning Star, the stations are responsible for the direction and cost of those efforts. *Id.*, ¶ 15.

Salvex can offer no evidence to prove to prove a joint business enterprise between the defendants. Therefore, that cause of action should be dismissed as a matter of law.

## V.      CONCLUSION

Plaintiff cannot offer any credible evidence establishing the existence of a material question of fact as to necessary elements of each of Plaintiff's claims. Accordingly, the Court should grant Defendants' Motion for Summary Judgment and should award them any further relief to which they are entitled in law or equity.

DATED this 11th day of October, 2019.

Respectfully submitted,

**TOUSLEY BRAIN STEPHENS PLLC**

By: _/s/ Kevin A. Bay_
    Kevin A. Bay, WSBA #19821
    kbay@tousley.com
    1700 Seventh Avenue, Suite 2200
    Seattle, Washington  98101
    Telephone:  206.682.5600
    Fax: 206.682.2992

MUNSCH HARDT KOPF & HARR, P.C.

By:   /s/ Kenneth W. Bullock, II
Kenneth W. Bullock, II
State Bar No. 24055227
Bayley B. Estep
State Bar No. 24097346
700 Milam, 27th Floor
Houston, Texas  77002
Telephone:      (713) 222-1470
Facsimile:      (713) 222-1475
kbullock@munsch.com
bestep@munsch.com

ATTORNEYS FOR DEFENDANTS

## Certificate of Service

I hereby certify that on this the 11th day of October, 2019, I caused to be served a true and correct copy of the above and foregoing document by electronically filing it with the Court using the CM/ECF system, which sent notification to all parties of interest participating in the CM/ECF system in this proceeding.

 /s/ Kenneth W. Bullock, II
Kenneth W. Bullock, II

5720/010/534563.6
4833-1480-5161v.1

26