# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SALVEX, INC., | § | |
| | § | |
| Plaintiff, | § | CIVIL ACTION NO: 4-18-cv-01175 |
| | § | |
| v. | § | JURY |
| | § | |
| TRANSFAIR NORTH AMERICA INTERNATIONAL FREIGHT SERVICES, LLC AND TRANSGROUP EXPRESS, INC., | § § § | |
| | § | |
| Defendants. | § | |

**DECLARATION OF ANGIE SANTILLAN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

I, Angie Santillan, declare as follows:

1.   I am the Chief Operating Officer of Transfair North America International Freight Services, LLC and Transgroup Express, LLC.  I submit this declaration in support of Defendants' Motion for Summary Judgment.  I am over the age of majority, have personal knowledge of the facts set forth herein and am competent to testify thereon.

2.   Transfair North America International Freight Services, Inc. was formed in Washington State in 1986. Since its inception, Greg Vernoy and Christine Dearden were shareholders and, as of 2007, they were the only shareholders. In September 2016, they sold their shares to an equity fund. Contemporaneous with that sale, the new owner converted the corporation to a limited liability company. TransGroup Global, Inc. now holds 100% of the membership units of Transfair North America International Freight Services, LLC (hereafter, "Transfair"). Vernoy and Dearden own minority interests in TransGroup Global, Inc. Vernoy currently serves as Chief Executive Officer of

Transfair.

3. Transgroup Express, Inc. was formed in Washington State in 1989. Its three founders and shareholders were Greg Vernoy, Christine Dearden and Ron Lee. Those three sold their shares in September 2016 to the same fund that acquired Transfair. Consistent with the Transfair acquisition, the new owner converted Transgroup Express, Inc. to Transgroup Express, LLC. TransGroup Global, Inc. now holds 100% of Transgroup Express, LLC (hereafter, "Transgroup Express"). Vernoy, Dearden and Lee own minority interests in TransGroup Global, Inc. Lee currently serves as President of Transgroup Express.

4. TransProject, LLC was formed in Texas in 2009. Its members were Greg Vernoy (49%), Christine Dearden (21%), Susan St. Germain (25%), and myself (5%). St. Germain was TransProject's Executive Director of Projects. TransProject was dissolved in 2017.

5. Transgroup Express and Transfair both operate under the trade name "Transgroup Worldwide Logistics," which was recently modified to "Transgroup Global Logistics" as well as "Transgroup International" and "Transfreight Express Lines" for international services. Transgroup Express and Transfair individually or jointly own dozens of other trade names and service marks around the world.  Examples of those marks include Trans-Show, TransAviation, TransFilm, TransVine, TransMarine, TransGolf, TransExhibit and TransWear. These trade names and service marks are registered in the U.S. and/or foreign countries, and are licensed to companies who contract with Transgroup Express and/or Transfair to use in marketing their services to particular regions or industries.

6. Transgroup Express and Transfair both provide back-office services, primarily accounting (payables and receivables), to a network of shipping companies for a fee. The difference is that Transgroup Express provides these services to shipping companies who handle domestic freight, while Transfair provides the services to shipping companies who handle international freight.

7. The services that TransGroup Express and Transfair provide to shipping companies include accounting, vendor payables and collecting; information technology and software solutions; logistics expertise; regulatory compliance assistance; cargo claims coordination; and experience /

relations with vendors. For international freight, Transfair holds a U.S. Customs license and other licenses and has contacts with a network of foreign agents to accommodate needs in other countries. Transgroup Express and Transfair can negotiate volume rates on behalf of the group of companies they work with and they have name recognition which the stations can leverage to secure business.

8. The shipping companies within the Trangroup Express and Transfair network are informally referred to as "stations." Transgroup Express and Transfair have about 90 stations on five continents around the world. Some stations are owned in whole or in part by Transgroup Express and/or Transfair, some are owned in whole or part by one of the original owners of Transgroup Express, and others are owned by third parties. Regardless of its ownership structure, each station is an independent company.

9. When stations contract with Transgroup Express and Transfair, they sign a Transportation Services Agreement ("TSA"). TransProject was one of the stations that contracted with Transgroup Express and Transfair. A true and correct copy of the TSA between TransProject and Transfair is attached hereto as Exhibit A.  A true and correct copy of the TSA between TransProject and Transgroup Express is attached hereto as Exhibit B.

10. TransProject, like every other station, had its own financing and profits and losses and did not share or comingle its funds with Transgroup Express or Transfair. TransProject leased its own office and warehouse space.  Attached hereto as Exhibit C is a true and correct copy of the Sublease Agreement by which TransProject leased office and warehouse space in Houston.  TransProject also bought or leased its own forklifts and warehouse equipment, as well as its computers and office furniture. TransProject did not share employees or staff with either Transgroup Express or Transfair; rather, it had its own employees and did its own hiring, firing and training. I have attached as Exhibit D true and correct copies of TransProject's employee payroll records for 2012 and 2016.  Similar records were maintained for each year TransProject operated and we have produced those payroll records to plaintiff.  I have not included all of them here for the sake of brevity.

11. TransProject maintained its own bank accounts, and kept its own books and records.  I have attached as Exhibit E two examples of TransProject's balance sheet and revenue and expense

records, one for 2012 and one for 2016. The same records were maintained for each year TransProject operated and we previously produced copies of those records to plaintiff. For the sake of brevity, I have not included the financials for every year. I have also attached as Exhibit F a true and correct copy of the signature card for the TransProject's bank account to show that TransProject maintained its own bank account at JP Morgan Chase in Houston.

12. TransProject paid its own taxes and filed its own tax returns. Attached as Exhibit G is a true and correct copy of TransProject's 2016 federal tax return. I have attached the 2016 return as an example of the federal tax returns TransProject filed each year of its existence. Those returns have been previously produced to plaintiff.

13. TransProject had its own marketing materials, and otherwise operated autonomously throughout its history. Attached as Exhibit H are true and correct copies of some of TransProject's marketing materials.

14. Per the TSAs, Transgroup Express and Transfair stored TransProject's financial and shipping data on their servers and hosted email traffic for TransProject. Transgroup Express and Transfair does the same for all their stations; however, TransProject had access only to its information and not to information pertaining to other stations. Neither Transgroup Express nor Transfair controlled how TransProject operated, or how and with whom TransProject conducted business. Neither Transgroup Express nor Transfair provided sales leads, or maintained customer lists for TransProject. Although Transgroup Express and Transfair have relationships with vendors and international shipping companies, respectively, TransProject was not required to use them. Similarly, Transgroup Express and Transfair did not dictate the rates TransProject charged.

15. When TransProject (or any another station) moves freight for a customer, the contractual relationship with Transgroup Express and/or Transfair works as follows: The station – acting under the TransGroup Global Logistics, Transgroup International and Transfreight Express Lines trade names – is hired by a customer to move freight from point A to point B via the mode (air, sea, or ground) chosen by the customer. If it is an international movement, the station may also contract with a customs broker, stevedore or other vendor. The freight is moved on a Transgroup

International/ Transfreight Express Lines bill of lading for international services, and Transfair pays the carriers, brokers and other vendors necessary to move the freight. The customer is then billed by the station and remits payment to Transfair. If the customer does not pay within credit terms, Transfair works to collect the amounts due on behalf of the station and if any third party collection costs occur, those are charged to the station. The vendor costs and revenue are captured in daily "recaps" prepared by the station and Transfair pays the station the net revenue based on the "recapped" costs.  When the customer pays, Transfair is then reimbursed from that revenue for the carrier and vendor costs it advanced, and collects the fee due for its services. Transfair also retains a certain percentage of the station's funds to accommodate future uncollected receivables. Net revenue is paid to the station weekly. Transgroup Express operates the same way for stations performing domestic services.

16. TransProject provided more than 2,000 pages of recaps to plaintiff some time ago. Those recaps reflect all financial transactions and activity between TransProject and both Transgroup Express and Transfair since 2014.  Attached as Exhibit I is an example of the recaps TransProject produces.  These recaps are from Transfair and show all TransProject's financial activity with Transfair for the week ending January 27, 2017. The recaps reflect all of the charges associated with the services provided to the customer identified. The fees due from TransProject to Transfair under their TSA are reflected in the "AcctFee" line.  The recaps show that the only transactions between TransProject and either Transfair or Transgroup Express were reimbursement of vendor costs and payment of fees due under the TSAs.

17. TransProject was created to penetrate the niche market of large, complicated movements of oversized industrial equipment. Our objective was to use its status as a Minority and Woman Owned Business to penetrate a largely male-dominated sector of industry. St. Germain had a strong background in that sector and, as Executive Director of Projects, was in charge of business development and operations for TransProject.

18. Early on, TransProject was doing well.  But then it became entangled in a project with a company named Spinning Star Energy, LLC ("Spinning Star").  Our dealings with Spinning Star

ultimately put TransProject out of business.

19. Spinning Star was supposed to be a billion dollar wind energy project in East Texas, featuring the first joint venture between a Chinese conglomerate and a U.S. company. It began in the depth of the 2008 recession so its promise of constructing plants and providing manufacturing jobs was welcomed. Senator Harry Reid hosted the Chinese officials in hopes of securing one of the plants for Nevada. Attached as Exhibit J is a newspaper article about Spinning Star. We understood that General Electric secured a nearly half billion dollar contract to build the gearboxes, a fact later confirmed in a lawsuit between those entities. TransProject was solicited to be a logistics provider. The work promised to TransProject included importing 300 massive wind turbines from China and then moving them on retrofitted trucks from the Port of Houston to the project site. On September 19, 2011, TransProject signed a contract to offload the first 12 turbines shipped from China and store them in a foreign trade zone in the Port of Houston. A true and correct copy of that contract is attached hereto as Exhibit K.

20. After shipping the first 12 turbines, Spinning Star never delivered another. Spinning Star's CEO, based in the U.S., lied to TransProject, telling the station that funding for the project was imminent, and convincing TransProject to advance the cost of storing the 12 turbines until its financing from China came through. Based on Spinning Star's promise that financing was imminent, TransProject signed a contract with Cooper T. Smith Stevedoring, agreeing to pay approximately $14,000 per month to store Spinning Star's 12 wind turbines in the Port of Houston.

21. The decision to pay storage costs on behalf of Spinning Star was costly and, in the end, ruined TransProject financially. At some point TransProject learned that Spinning Star was broke, that there was no Chinese financing coming, and that Spinning Star was never going to reimburse TransProject for the storage costs. TransProject could not afford to continue to pay the $14,000 monthly storage costs, but when TransProject failed to pay, Cooper T. Smith Stevedoring refused to release freight TransProject was shipping for other customers.

22. This confluence of events put TransProject's entire business in jeopardy: it could not afford to continue to pay $14,000 per month to store Spinning Star's turbines, and it could not stop

paying the storage costs because Cooper T. Smith Stevedoring would hold hostage the freight TransProject was moving for other customers. Attached as Exhibit L is a true and correct copy of a letter I sent to Spinning Star advising of Cooper T. Smith Stevedoring's position. Further, TransProject did not have sufficient cash reserves to continue funding the storage costs for the period of time it would take to commence a lawsuit against Spinning Star, obtain a judgment, and then collect that judgment. So TransProject decided its only option was to exercise its contractual lien rights and try to quickly sell the turbines via lien foreclosure sale.

23. TransProject retained Salvex to auction the turbines in October 2013. TransProject gave Spinning Star notice of the sale, but Salvex controlled all other aspects of the sale, including advertising and bidding procedures.

24. On December 6, 2013, Salvex informed TransProject that the winning bid was $720,000. Salvex did not disclose the identity of the buyer. A true and correct copy of the document Salvex sent to TransProject identifying the bids received for the turbines is attached hereto as Exhibit M.

25. The sale closed in January 2014 and Salvex paid $720,000 to TransProject. TransProject applied $317,828.75 to satisfy the outstanding balance owed by Spinning Star. TransProject held the remainder of the sale proceeds because of conflicting claims to the money. Spinning Star claimed the excess proceeds belonged to it.  Other creditors of Spinning Star were also making claims to the funds.  Then Spinning Star filed a lawsuit against TransProject for selling its turbines, claiming $20 million in damages. After Spinning Star filed the lawsuit, Violet Rose voluntarily joined the lawsuit seeking a return of its purchase price. Because of these competing claims, TransProject retained the excess sale proceeds pending direction from the court.

26. After the Spinning Star lawsuit was filed, TransProject learned that Salvex had not told us the truth about the auction:  the winning bid for the turbines was $1.1 million, not $720,000. Salvex orchestrated a $400,000 commission for selling the turbines, and concealed that commission from TransProject. Attached as Exhibit N is an email from Salvex to the winning bidder stating that the winning bid was $1,140,000.  I did not see this document nor did I learn that the winning bid was

more than $1.1 million until sometime during the Spinning Star lawsuit, which explained why Violet Rose was suing TransProject for $1.1 million rather than for the $720,000 we received from the sale of the turbines.

27.     In the Spinning Star lawsuit, Violet Rose obtained a $1.1 million judgment against TransProject.  In addition to this judgment, TransProject accrued other debt while the Spinning Star lawsuit was pending. Since Violet Rose never took possession or moved the turbines after it purchased them, Cooper T. Smith Stevedoring continued charging TransProject monthly storage costs.  Between the mounting costs owed to Cooper T. Smith Stevedoring, legal fees for the Spinning Star litigation, some uncollectable accounts receivable, and then the judgment to Violet Rose, TransProject's debt became too large to manage. TransProject transferred to Violet Rose the excess sale proceeds (approximately $400,000) it had been holding since the auction sale. It was unable, however, to satisfy the remainder of the judgment. Facing continued collection efforts from Violet Rose, TransProject was forced to close its business.  Attached hereto as Exhibit O is a true and correct copy of a Resolution signed by all members of TransProject.

28.     Up until Violet Rose obtained its judgment, TransProject was surviving financially.  I would not say it was thriving as it made no distributions to its owners for the last several years of its existence.  However, the company was solvent and was paying all its employees and vendors until the Violet Rose judgment was entered and the company was unable to pay it.

29.     Sometime after TransProject closed, I became aware that Violet Rose Holdings had obtained a judgment against Salvex.  I became aware of this because Salvex's owner, Charlie Gibson, made a number of aggressive and threatening phone calls to Ron Lee demanding money.  Mr. Gibson then posted a series of untrue, and we believe slanderous, statements on certain social websites about fraudulent activity by Transgroup Express, and continues to do that now, all of which I take as an attempt to extort money from those companies.

30. I declare under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct.

DATED this 2nd day of May, 2019 at Seattle, Washington.

_____
Angie Santillan

5720/010/535910.1