IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SALVEX, INC. | § | |
| | § | |
| Plaintiff, | § | CIVIL ACTION NO: 4-18-cv-01175 |
| | § | |
| v. | § | JURY |
| | § | |
| TRANSFAIR NORTH AMERICA | § | |
| INTERNATIONAL FREIGHT SERVICES, | § | |
| LLC AND TRANSGROUP EXPRESS, INC., | § | |
| | § | |
| Defendants. | § | |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

Defendants Transfair North America International Freight Services, LLC ("Transfair") and Transgroup Express, LLC ("Transgroup Express") submit this Reply in support of their Motion for Summary Judgment.

Salvex attaches a mountain of evidence to its response in opposition to Defendants' summary judgment motion, attempting to convey the impression that based on sheer volume alone, there must be a question of fact. Salvex strings together a series of misinformed observations and conjecture about the business structure and relationships of the Defendants, fails to explain how the evidence supports its contentions, and fails to identify where such evidence can be found in its numerous exhibits. Ultimately, Salvex fails to establish that there is a material question of fact on all elements of its claims.

**A. Salvex does not offer evidence sufficient to raise an issue of fact as to its fraudulent transfer claims and therefore those claims should be dismissed.**

In its Response, Salvex identifies, for the first time, the alleged transfers upon which it bases its fraudulent transfer claim. Specifically, Salvex alleges that TransProject transferred to

1

one of the defendants (1) customer accounts, (2) accounts receivable, (3) corporate goodwill, and (4) debt. Pl. Response, p. 24-25. As discussed in defendants' motion, Salvex bears the burden of proving each element of a fraudulent transfer claim. *Doyle v. Kontemporary Builders, Inc.*, 370 S.W.3d 448, 453 (Tex. App.—Dallas 2012, pet. denied). The most obvious element of a fraudulent transfer claim is the existence of a transfer. *See* Tex. Bus. & Com. Code §§ 24.005(a)(1), 24.006(a). Salvex offers no evidence that raises an issue of fact as whether TransProject transferred an asset to defendants.

      1.      **The alleged transfer of customer accounts from TransProject to Defendants.**

Salvex alleges that TransProject transferred to Transfair or Transgroup Express customer accounts with UT-Batelle, Evapco, Delta Fabrication & Machine, and SPX Cooling. (Response, at ¶10, pg. 3; ¶15, pg. 6; ¶19, p. 7 and exh. 30). Salvex supports this claim with citations to its exhibits 11, 12, 13 and 14, none of which evidence a transfer of an account, and the testimony of Angie Santillan, who likewise did not testify to any transfer of an account or contract. Contrary to Salvex' unsupported allegations, the undisputable facts demonstrate that TransProject did not, as a matter of law, transfer any customer contract or account to Transfair or to Transgroup Express.

      a.      <u>UT-Batelle:</u>

Salvex alleges the TransProject transferred its contract with UT-Batelle to Transfair in February 2017. There was, in fact, no such transfer.

On April 2, 2013, TransProject signed Basic Ordering Agreement ("BOA") 4200000481 with UT-Batelle, LLC (hereinafter the "BOA"), contracting to provide certain logistics services. Decl. of Angie Santillan In Support of Defendants' Reply on Motion for Summary Judgment "Santillan Reply Decl."), ¶ 3 exh. O. The BOA prohibited TransProject from assigning or

transferring the contract or TransProject's obligations thereunder to another entity. *Id.*, exh. O at p. 8.

On March 1, 2017, TransProject notified UT-Batelle by letter that it had ceased operations and therefore was terminating the BOA 4200000481. *Id.*, exh. P. At the time of termination, there was one shipment of cargo in process. *Id.*, ¶ 4. That shipment had left Japan on January 29, 2017. *Id.* As part of the process of winding down TransProject, Angie Santillan oversaw the completion of that shipment. *Id.* The cargo was delivered to the consignee on March 6, 2017, and the invoice was issued to UT-Batelle. *Id.*, exh. Q. UT-Batelle paid the invoice on May 1, 2019, and the payment was credited to TransProject. *Id.*, ¶ 4, exh. R.

After TransProject had dissolved, and Transfair had hired Susan St. Germain, she solicited work from UT-Batelle. Santillan Reply Decl., ¶ 5. On August 25, 2017, UT-Batelle entered into another contract, BOA 4200000700, with Transfair. *Id.*, exh. S. Thus, the first contract, BOA 4200000481, was between UT-Batelle and TransProject and the second contract, BOA 4200000700, was between UT-Batelle and Transfair. Transfair performed services for UT-Batelle under the second contract until Susan St. Germain left Transfair for a competitor. *Id.*, ¶ 5.

Accordingly, TransProject did not transfer, and in fact had no ability to transfer, its contract with UT-Batelle to Transfair. Rather, TransProject's contract with UT-Batelle was terminated and five months later UT-Batelle signed a separate contract with Transfair for logistics services. As a matter of law, TransProject did not fraudulently transfer a contract to Transfair.

Nor is the fact that Transfair elected to work with UT-Batelle otherwise actionable. An employee of a company that dissolves is not precluded from soliciting the dissolved company's

3

former customers. *See, e.g.*, *Trask v. Susskind*, 376 F.2d 17 (5th Cir. 1967) ("This court held that the bankrupt was not precluded from soliciting his former customers. There is no reason why the employees of a corporation should not have the same right to engage in the same business activity when the corporation declares bankruptcy.").

      b.     <u>Delta Fabrication</u>.

Salvex also claims that TransProject transferred its account with Delta Fabrication to one of the defendants. This claim fails for the simple reason that Delta Fabrication was never a customer of TransProject and, consequently, there was no customer account for TransProject to transfer. Transgroup Express provided logistics services to Delta Fabrication in April 2018, and Delta Fabrication paid Transgroup Express in September 2018. Santillan Reply Decl., ¶ 6 and exh. T. This was more than a year after TransProject ceased operations. During its existence, TransProject did not provide services to Delta Fabrication. *Id*.

      c.     <u>Evapco.</u>

Salvex's allegation that TransProject transferred a contract with Evapco to one of the defendants is likewise unsupportable. TransProject provided services to Evapco. Santillan Reply Decl., ¶ 7. At the time TransProject ceased operations, there were five shipments of freight enroute from Asia. *Id.* As part of the process of winding up TransProject, Angie Santillan oversaw the completion of these cargo shipments. *Id.* Four of the shipments arrived and cleared U.S. Customs at various times in February, 2017, and the last one cleared in March 2017. *Id*. Once the shipments were completed, invoices were issued on behalf of TransProject. *Id*., exh. U. Those invoices were paid on the dates reflected in Exhibit 26 to Salvex's Response. *Id.* The money received was allocated to TransProject. Santillan Reply Decl., ¶ 7, exh. V.

While TransProject provided heavylift services to Evapco, at its request, after TransProject dissolved, TransProject did not transfer any contract or receivable to either Transfair or Transgroup Express. *Id*., ¶ 8.

d. <u>SPX Cooling</u>.

Finally, Salvex alleges that TransProject transferred its account with SPX Cooling to one of the Defendants. As with the other claims, this fails for lack of proof. SPX Cooling and its family of companies have been long-standing customers of TransProject and other Transfair stations. Santillan Reply Decl., ¶ 9. TransProject provided heavylift logistics services to SPX Cooling while other stations provided general, commercial logistics. *Id.* After TransProject dissolved, and Susan St. Germain began working for Transfair, SPX Cooling did contact her for additional heavylift projects. Thus, while Tranfair did do work for SPX Cooling after TransProject dissolved, no contract or receivable was transferred from TransProject to Transfair or Transgroup Express. *Id.*

Salvex does not raise an issue of material fact as to its claim that TransProject transferred customer accounts to the Defendants.

**2. The alleged transfer of accounts receivable from TransProject to Defendants.**

Salvex claims that TransProject transferred accounts receivable to one of the Defendants. Response, p. 24-25. But Salvex does not identify which accounts receivable were allegedly transferred. In fact, no accounts receivable were transferred from TransProject to either Transfair or Transgroup Express. *See* Santillan Reply Decl., ¶ 10. There is no issue of fact with respect to this claim.

5

### 3. The alleged transfer of corporate goodwill from TransProject to Defendants.

Salvex next claims that TransProject transferred corporate goodwill to one of the Defendants. This claim fails as a matter of law for at least four reasons.

First, corporate goodwill cannot be transferred separate and apart from tangible assets. *Trask v. Susskind*, 376 F.2d 17, 20 (5th Cir. 1967). Since TransProject did not transfer any tangible assets to Transfair, there could be no corresponding transfer of its purported goodwill. Second, goodwill does not exist apart from a reasonably profitable business. *In re Bob Nicholas Enterprise, Inc.*, 358 B.R. 693, 703 (Bankr. S.D. Tex. 2007). Once a business ceases to operate, goodwill is extinguished. *Id.* As Salvex admits, TransProject was insolvent by January, 2017. *See* Pl.'s Response, at ¶ 19, pg. 29. Thus, as a matter of law, TransProject possessed no goodwill in February 2017.

Third, even if TransProject had goodwill in February 2017, it could not have transferred the goodwill to either of the defendants. TransProject was formed to take advantage of opportunities available to women and minority owned businesses. *See* Dkt. #49, Declaration of Angie Santillan in Support of Defendants' Motion For Summary Judgment, at ¶ 17. To the extent TransProject had any goodwill, it would be tied to its status as a woman owned business. TransProject's status as a woman-owned business, however, was dependent on the characteristics of its shareholders and did not belong to TransProject. *In re Bob Nicholas Enterprise, Inc.*, 358 B.R. at 705. Further, certification as a woman owned business cannot be transferred. *Id.* Thus, TransProject's goodwill, if it existed at all, could not be transferred to either defendants since neither was woman or minority owned.

Fourth and finally, the only evidence offered by Salvex demonstrates that TransProject had no goodwill. Salvex apparently relies on the fact that three customers of TransProject sought

6

logistics services from Transfair after TransProject ceased operating. However, TransProject was providing services to more than 50 customers in its final period of operations. *See* Response, Salvex's exh. 11. The transition of 6% of TransProject's customers to Transfair does not support a claim that TransProject transferred its goodwill. *See Trask*, 376 F.2d at 20 (finding that no transfer of goodwill occurred when "fifty to sixty percent of the bankrupts' prior business went to competitors instead of to [defendants' new company]").

Salvex attempts to circumvent these fatal problems by pointing to *Airflow Houston, Inc. v. Theriot*, for support. 849 S.W.2d 928 (1993). But that case does not overcome the obstacles set out above. There, the court found that the defendant was an ongoing, operating business and had transferred goodwill along with tangible assets. Those are the distinguishing facts. Here, TransProject had ceased operations, terminating any goodwill it may have had, and did not transfer any tangible assets to either defendant. Further, in *Airflow Houston*, the plaintiff established that the defendant had goodwill. Here, Salvex had offered no evidence that TransProject had any goodwill—it simply makes that assumption— and does not explain how such goodwill, if it existed at all, could exist independent of TransProject's status as a woman-owned business.

As a matter of law, Salvex' claim that TransProject fraudulently transferred corporate goodwill to one of the defendants fails.

**4.     The alleged transfer of debt from Transfair to TransProject.**

Salvex's final purported transfer is that Transfair transferred debt to TransProject. Response, ¶ 17, page 7. First, even if Transfair did transfer debt to TransProject, that is a transfer by Transfair, not a transfer by TransProject. Therefore, it is not actionable as a fraudulent transfer by TransProject. But even so, there is no evidence that Transfair transferred debt to TransProject.

7

Salvex cites to a Notice of Change to a company called Cargo Network Services Corp. and Christine Dearden's testimony, but neither support a claim that Transfair "shifted" more than $400,000 in debt to TransProject. It appears Salvex is confused about Ms. Dearden's testimony. In her deposition, Ms. Dearden talks about TransProject's debt and whether Transfair would absorb some of that debt by waiving its commissions on TransProject's unpaid receivables. But nowhere in her deposition does she even mention any Transfair debt, let alone discuss transferring Transfair's debt to TransProject. See Salvex's Response, exh. D (Dearden depo.) at 84-88. In any event, it is unclear how Salvex thinks it will benefit from a reversal of a transfer of debt to TransProject.

**B.**     **Plaintiff's alter ego claims should be dismissed because neither Transgroup Express nor Transfair are members of TransProject.**

As set forth in Defendants' motion, "Texas courts will not apply the alter ego doctrine to directly or reversely pierce the corporate veil unless one of the 'alter egos' owns stock in the other." *Permian Petroleum Co. v. Petroleos Mexicanos*, 934 F.2d 635 (1991). Salvex proclaims that defendants misstate the law and suggests that the *Permian Petroleum* ruling can be ignored. But Salvex does nothing more: it cites no authority and provides no analysis as to why *Permian Petroleum* is not applicable. Plaintiff has pointed to no contrary authority and Defendants have found none. *Permian Petroleum* and its progeny outlined in Defendants' motion are controlling and dispositive. Plaintiff does not dispute that neither Defendant owned shares in TransProject; thus, Salvex cannot pierce the corporate veil or establish alter ego against either of them.

**C.**     **Salvex also fails to address the factors relevant to determining whether or not Transgroup Express or Transfair is the alter ego of TransProject.**

Even if Salvex could get past the Defendants' lack of ownership in TransProject, its theory still fails for lack of proof. As explained in Defendants' motion, there are at least ten

factors the court must consider in determining whether a corporation is the alter ego of another. *See U.S. KingKing, LLC v. Precision Energy Servs., Inc.*, 555 S.W.3d 200, 213–14 (Tex App.—Houston [1st Dist.] 2018); Dkt. 49 at 20. Salvex does not address those factors in its Response, perhaps because they unanimously demonstrate that TransProject is entirely separate from Transfair and Transgroup Express.

> (1) Whether the entities shared common business names, offices, employees, or accounting.

TransProject did not "share" business names, offices, employees or accounting with either defendant. Rather, Transfair and Transgroup Express *licensed* its trade names and provided accounting services to TransProject for a fee under the terms of the two Transportation Services Agreements ("TSAs"). *See* Dkt. #49, Santillan Decl.at ¶ 5, 6, 9, and exhs. A, B. TransProject subleased office space from another station, TransIAH, LLC, but did not share space with either Transgroup Express or Transfair. *Id.*, ¶ 10, exh. C. Finally, Transfair hired some former TransProject employees after TransProject closed, but the entities never shared employees while TransProject was in business. *Id.,* ¶ 10, exh. D.

> (2) Whether one entity paid the others' employees.

Salvex offers no evidence – and there is no evidence – that either Transgroup Express or Transfair ever paid any TransProject employee while they were employed by TransProject. *Id*., ¶ 10.

> (3) Whether one entity performed services on behalf of the other.

The only evidence is that Transfair and Transgroup Express provided services to TransProject under the terms of their respective TSAs. *Id*., ¶ 9, exhs. A, B. Further, Transfair contracted on several occasions to provide US Customs services to TransProject for a fee. *Id*., ¶ 7. The fact that all services performed for TransProject by either Transgroup Express or Transfair

9

were done under contract and for a fee evidences that the parties were separate entities and disproves they were alter egos.

(4) <u>Whether one entity made undocumented transfers of funds to the other entity.</u>

Salvex has offered no evidence – and there is no evidence – that Transgroup Express or Transfair made any undocumented transfers of funds to TransProject. To the contrary, all transactions between the parties were done pursuant to contract terms and fully accounted for in the daily recaps which have been produced to Salvex. *Id*., ¶ 11-13, 16.

(5) <u>Whether there is a clear allocation of profits and losses between the two entities.</u>

There is a clear allocation of profits and losses between the defendants and TransProject, which are reflected in the daily recaps and financial records produced in this case. *Id*.

(6) <u>Whether there was commingling of funds, or one entity paid the debts of the other.</u>

Salvex has the accounting records that reflect every transaction between TransProject and either Transgroup Express or Transfair, and can point to no instance where funds were comingled. *Id*., ¶ 16.

(7) <u>Whether one entity represented that it would financially back the other.</u>

Salvex offers no evidence – and there is no evidence – of either defendant representing that it would financially back TransProject. To the contrary, the TSAs between TransProject and the defendants prohibited all three entities from making such a claim. *Id*., exh. A at ¶ 7.2, and B at ¶ 7.2.

(8) <u>Whether company profits were diverted from one entity to the other.</u>

Likewise, Salvex offers no evidence – and there is no evidence – that TransProject diverted profits to either Transgroup Express or Transfair. All TransProject's financial records have been produced to Salvex, and those records account for every penny of profit TransProject

10

ever earned. *Id*., ¶ 11-13, 16. Although Defendants performed back-office services for TransProject, including billing and accounting, Salvex has not identified a single transaction in which either Defendant failed to distribute the correct funds to TransProject.

(9) <u>Whether there was inadequate capitalization of one entity.</u>

The unrebutted evidence is that TransProject was profitable until the Violet Rose judgment was entered. *Id*., ¶ 18, 28.

(10) <u>Whether there were other failures to keep assets separate.</u>

The defendants have produced all documents requested by Salvex and Salvex has taken the depositions of all the principals of TransProject, Transgroup Express and Transfair. After full discovery, Salvex identifies no evidence that TransProject and the defendants failed to keep their respective assets separate.

Rather than address the relevant factors in the alter ego analysis, Salvex tosses out a number of broad, conclusory statements. As set out below, those statements either do not support an alter ego claim or have no evidentiary support.

In paragraphs 22, 23 and 24 of its Response, Salvex describes the various roles of TransProject's owners and the defendants' performance under their contracts with TransProject to show that Transgroup Express and Transfair exercised control over TransProject and other stations. While much of what Salvex alleges lacks evidentiary support, it does not, in any event, support Salvex's alter ego claim. That is because even if Salvex's allegations were supported, Texas law is clear: neither Transgroup Express nor Transfair can be held jointly liable for TransProject's obligations "merely because of centralized control, mutual purposes, and shared finances." *SSP Partners v. Gladstrong Invs. (USA) Corp*., 275 S.W.3d 444, 455 (Tex. 2008).

11

Next, Salvex alleges that defendants required TransProject to use their billing software (Response, ¶ 23); prohibited TransProject from issuing invoices that did not utilize defendants' forms (Response, ¶ 23); provided marketing services, IT services and software training to TransProject (Response, ¶ 22,); collected invoices from customers for whom TransProject provided services (Response, ¶ 26); provided an accounting system that reconciled payables and receivables (Response, ¶ 39); provided back-office administrative services (Response, ¶ 26); consolidated liability insurance for TransProject and other stations to gain more favorable premiums (Response, ¶ 37); and offered, for a fee, U.S. Customs' brokerage services and U.S. Customs bonds (Response, ¶¶ 29, 35, 36, 38). This evidence, however, does not support Salvex' alter ego claim. Rather, this evidence reinforces the fact that TransProject's relationship with Transgroup Express and Transfair was dictated by the terms of their contracts, the observance of which inherently shows that the parties were separate entities that operated independently.

Salvex also takes liberty with some facts. For example, Angie Santillan and Christine Dearden were involved, along with Susan St. Germain, in decisions on how to collect debt from Spinning Star Energy and the ultimate decision to exercise its lien rights and auction the turbines. Since Ms. Santillan and Ms. Dearden were employees of Transfair and Transgroup Express, Salvex claims those entities "controlled" TransProject. But this ignores Ms. Santillan and Ms. Dearden's role as owners of TransProject.  They made decisions for TransProject as owners of TransProject, not on behalf of Transfair or Transgroup Express. Salvex makes the same mistake with respect to Ms. Dearden being a signator on TransProject's bank account (Response, ¶ 34), assigning it some sinister motivation. But Ms. Dearden was the owner of TransProject charged with the financial and accounting responsibilities, so of course she was in charge of the company's bank account.

Despite its lengthy recitation of purported "facts," Salvex offers no evidence that raises an issue of fact as to the elements of its alter ego claim. That claim should therefore be dismissed as a matter of law.

**D.     Salvex can produce no evidence of actual fraud on the part of either Defendant.**

Even if Salvex could show the existence of a material question of fact on the factors used to determine if entities can be considered alter ego, in order to prevail on its alter ego theory, Salvex is also required to establish that defendants' purported abuse of the corporate form was illegitimate or fraudulent. *KingKing*, 555 S.W.3d at 219. Salvex must show—through evidence—that (i) defendants used the corporate structure to shield abuse such as 'fraud, evasion of existing obligations, circumvention of statutes, monopolization, criminal conduct, and the like,' and (ii) the abuse was committed for the "direct personal benefit" of the defendant company. *KingKing*, 555 S.W.3d at 219; Tex. Bus. Org. Code § 21.223(b).

Salvex offers nothing to establish that either defendant abused the corporate form. Nor does Salvex show that Transgroup Express or Transfair received any "direct personal benefit" as a result of any purported, unspecified abuse. Because Salvex cannot prove the required elements to pierce the corporate veil under Texas law, defendants are entitled to summary judgment on this claim.

**E.     Salvex' claims for conspiracy and joint business enterprise.**

With respect to Salvex' claims for conspiracy and joint business enterprise, defendants rest on their initial motion, particularly sections C and E thereof, and request those claims be dismissed as a matter of law.

## CONCLUSION

There are no genuine issues of material fact. Accordingly, the Court should grant Defendants' Motion for Summary Judgment.

DATED this 1st day of November, 2019.

        Respectfully submitted,

        **MUNSCH HARDT KOPF & HARR, P.C.**

        By: /s/ *Kenneth W. Bullock, II*
        Kenneth W. Bullock, II
        State Bar No. 24055227
        Bayley B. Estep
        State Bar No. 24097346
        700 Milam, 27th Floor
        Houston, Texas 77002
        Telephone: (713) 222-1470
        Facsimile: (713) 222-1475
        kbullock@munsch.com
        bestep@munsch.com

        Kevin A. Bay (admitted *pro hac vice*)
        TOUSLEY BRAIN STEPHENS PLLC
        1700 Seventh Avenue, Suite 2200
        Seattle, WA 98101
        Telephone: (206) 682-5600
        Facsimile: (206) 682-2992
        kbay@tousley.com

5720/010/544447.1
4851-8023-1339v.1