United States District Court
Southern District of Texas

**ENTERED**

August 12, 2020

David J. Bradley, Clerk

# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| SALVEX, INC., | § | |
| *Plaintiff,* | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 4:18-cv-1175 |
| | § | |
| TRANSFAIR NORTH AMERICA INTERNATIONAL | § | |
| FREIGHT SERVICES, INC. ET AL., | § | |
| *Defendants.* | § | |

## <u>MEMORANDUM, ORDERS, AND RECOMMENDATION</u>

This case is before the Court on Defendants' Motion for Summary Judgment on Plaintiff's claims to execute on Plaintiff's judgment against an affiliated company by setting aside Defendants' corporate structure or recovering fraudulent transfers. Dkt. 49.[1] Having considered the parties' submissions[2] and the law, the Court recommends that Defendants' Motion for Summary Judgment be granted in part and denied in part without prejudice as

---

[1] The District Court referred this case to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. Dkt. 61.

[2] Defendants have moved to strike Plaintiff's Supplemental Response to the Motion for Summary Judgment (Dkt. 54) because it is 58 pages long. Dkt. 57. At the time Plaintiff filed the Supplement Response this case was before United States Magistrate Judge Nancy Johnson on referral from United States District Judge Sim Lake. Judge Lake has a procedural rule limiting briefs to 25 pages absent leave of court. Plaintiff did not seek leave of court to file a brief in excess of 25 pages because Judge Johnson does not have a page limit rule. The Court concludes that there is no prejudice to Defendant in granting Plaintiff leave, albeit belatedly, to file a brief in excess of 25 pages, particularly since the Supplemental Response was filed within the 21-day deadline for responsive pleadings and raises no wholly new arguments not touched on in the original response. In addition, Defendant filed a Reply to the Supplemental Response that they concede is "not substantially different from its reply to the Plaintiff's original memorandum." Dkt. 58 n.1. Therefore, Defendants' Motion to Strike (Dkt. 57) is denied.

Plaintiff has filed a Motion to Strike certain portions of the Declaration of Angie Santillan and Defendants' Exhibits E, I, and J. Dkt. 50. Plaintiff's objection is that the Exhibits are not properly authenticated and, according to Plaintiff, are contradicted by other evidence. *See id.* Defendants have submitted in their Reply a Declaration from Santillan attesting that all Exhibits submitted in support of Summary Judgment are "true and correct copies of what they purport to be." Plaintiff's other objections go to the weight of the evidence or the merits of its claims, not to the admissibility of the evidence for summary judgment purposes. Plaintiff's Motion to Strike (Dkt. 50) is denied.

set forth below.[3]

## I.     <u>Background</u>[4]

Violet Rose Holdings, Ltd., Plaintiff Salvex, Inc.'s predecessor in interest, brought this case to collect on a judgment Violet Rose obtained against TransProject, LLC. TransProject, which operated a shipping and logistics business, was a Texas Limited Liability Company formed in 2009 by members Greg Vernoy (49%), Christine Dearden (21%), Susan St. Germain (25%) and Angie Santillan (5%).  TransProject was one of many companies that entered into contracts (Transportation Services Agreements) with Defendants Transfair North America International Freight Services, LLC d/b/a Transgroup International (Transfair)[5] and Transgroup Express, LLC (Express)[6] for the Defendants to provide back office services like accounting, vendor payables and collections, and information technology and software solutions.  Defendants refer to shipping companies with which they have Transportation Services Agreements as "stations."  Defendants contract with approximately 90 stations around the world, some of which are affiliated with Defendants' owner, TransGroup Global, Inc., and some of which are not.

In September 2011, TransProject entered an agreement to provide transportation and

---

[3] Defendants' initial Motion for Summary Judgment (Dkt. 48) is terminated as moot due to Defendants' filing of its corrected Motion for Summary Judgment (Dkt. 49).

[4] The facts recited in this section are set forth in the Declaration of Angie Santillan, Chief Operating Officer of Defendants, (D.Ex. 1, Dkt. 49-1) and are undisputed unless otherwise noted.

[5] Transfair was formed as a corporation in Washington State in 1986 by shareholders including Vernoy and Dearden who became sole shareholders in 2007.  It was sold to an equity fund in September 2016 and converted to an LLC. TransGroup Global, Inc. holds 100% of the membership units.  Vernoy and Dearden own minority interests in TransGroup Global, Inc.  Vernoy is CEO of Transfair

[6] Transgroup Express, Inc. was formed in Washington State in 1989 by shareholders Vernoy, Dearden, and Ron Lee. It was sold to an equity fund in September 2016 and converted to an LLC.  TransGroup Global, Inc. holds 100% of the membership units.  Vernoy, Dearden, and Lee own minority interests in TransGroup Global, Inc.  Lee is President of Transgroup Express.

shipping logistics for what was supposed to be a billion-dollar wind energy project in East Texas by a Chinese/American joint venture, Spinning Star Energy, LLC.  TransProject expected the work to involve the importation of hundreds of massive wind turbines from China and the transportation of the turbines from the free trade zone at the Port of Houston to the project site in East Texas.  Spinning Star shipped twelve turbines before the project fell through, allegedly due to massive fraud by Spinning Star.

Before the project fell through, TransProject signed a contract for storage of the twelve turbines with a stevedoring company on the promise that Spinning Star would reimburse TransProject for the storage fees.   After the project fell through, the turbines remained in storage in the free trade zone at the Port of Houston.  TransProject was unable to continue paying the ongoing storage fees, and the stevedoring company began holding cargo belonging to TransProject's other shipping customers until it received payment for the overdue fees, effectively eliminating TransProject's ability to move cargo through the Port of Houston for its customers.  Faced with this situation, TransProject hired Salvex to auction the twelve turbines being held in storage.  The winning bidder at the auction had funding difficulties and assigned its rights to the turbines to Violet Rose Holdings, Ltd. Once it received the funds from the auction, Salvex paid TransProject $720,000 and retained $400,000 as a commission on the sale.  Of the $720,000 TransProject received, it allocated approximately $318,000 to cover the outstanding balance owed to it by Spinning Star and retained the remaining approximately $400,000.

Spinning Star sued TransProject for improperly selling the turbines.  Because it was unable to obtain good title to the turbines, Violet Rose joined the lawsuit seeking a return of

its purchase price.   Violet Rose obtained a judgment in excess of $1 million against TransProject in December 2016.  TransProject paid Violet Rose the approximately $400,000 it had retained in excess sale proceeds but has not made any further payments on the judgment.

The Members of TransProject dissolved the company in February 2017.  Violet Rose sued Defendants in state court for the remainder due on Violet Rose's judgment against TransProject alleging alter ego liability and that Defendants obtained fraudulent transfers from TransProject.[7]  *See* Dkt. 1-3.  Defendants removed the state court case to this Court based on diversity jurisdiction.  Violet Rose filed a First Amended Complaint asserting causes of action for fraudulent transfer, conspiracy, alter ego/piercing the corporate veil, and joint business enterprise liability.  Dkt. 10.

Violet Rose sued Salvex in a separate lawsuit.  Violet Rose and Salvex settled their suit and as part of the settlement, Violet Rose assigned its claims against Defendants in this lawsuit to Salvex.  Accordingly, Salvex was substituted for Violet Rose as Plaintiff in this case.  Dkt. 19.

There is no dispute that Salvex, as assignee of Violet Rose, is the judgment creditor of TransProject.  The issue before the Court is whether Salvex, as a judgment creditor of TransProject, can recover from Defendants under a theory of fraudulent transfer, conspiracy, alter ego/piercing the corporate veil, or joint business enterprise liability.

---

[7] Trans IAH, LLC was also named as a defendant but has since been dismissed.  Dkt. 18.

## II.    Summary Judgment Standards

Summary judgment is appropriate if no genuine issues of material fact exist, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The party moving for summary judgment has the initial burden to prove there are no genuine issues of material fact for trial.  *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001).  Dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the nonmoving party.  *Hyatt v. Thomas*, 843 F.3d 172, 177 (5th Cir. 2016).  "An issue is material if its resolution could affect the outcome of the action." *Terrebonne Parish Sch. Bd. v. Columbia Gulf Transmission Co.*, 290 F.3d 303, 310 (5th Cir. 2002).  The court construes the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor.  *R.L. Inv. Prop., LLC v. Hamm*, 715 F.3d 145, 149 (5th Cir. 2013).  The party opposing summary judgment "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  *Id.*

## III.    Analysis

Defendants move for summary judgment on Plaintiff's causes of action for fraudulent transfer, conspiracy, alter ego/piercing the corporate veil, and joint business enterprise, arguing with respect to each that Plaintiff cannot meet its burden to create a genuine issue of material fact as to one or more elements of the claim.  The Court addresses each cause of action in turn.

### A. Fraudulent Transfer Claims

The party asserting a fraudulent transfer claim bears the burden of proof. *Matter of Galaz*, 850 F.3d 800, 804 (5th Cir. 2017) (judgment creditor has burden to prove fraudulent transfer by a preponderance of evidence). The Plaintiff must prove *all* elements of fraudulent transfer as to *each* alleged transfer at issue. *Doyle v. Kontemporary Builders, Inc.*, 370 S.W.3d 448, 453 (Tex. App.—Dallas 2012, pet. denied) (emphasis added). Liability for a fraudulent transfer under the Texas Uniform Fraudulent Transfer Act (TUFTA) is a two-step process requiring "first, a finding that a debtor committed an actual, fraudulent transfer, TUFTA § 24.005(a)(1), or a constructive, fraudulent transfer, *id*. § 24.005(a)(2); and, second, recovery of that fraudulent transfer, or its value, from the transferees, *id*. §§ 24.008–24.009." *Spring St. Partners-IV v. Lam*, 730 F.3d 427, 436 (5th Cir. 2013).

Plaintiff alleges that three types of fraudulent transfers provided for under TUFTA are at issue in this case: (1) a transfer or obligation made with the actual intent to hinder, delay, or defraud creditors under TEX. BUS. & COM. CODE § 24.005(a)(1); (2) a transfer made by the debtor while it was insolvent for which it did not receive a reasonably equivalent value in exchange under TEX. BUS. & COM. CODE § 24.005(a)(2); and (3) because Defendants are creditors whose claims arose before the transfer, a transfer made while insolvent to an insider[8] under TEX. BUS. & COM. CODE § 24.006. *See* Dkt. 54 at

---

[8] The term "insider" is defined in TEX. BUS. & COM. CODE § 24.002(7). In deciding whether a party is an insider courts consider (1) the closeness of the relationship between the debtor and transferee, and (2) whether the transaction was conducted at arm's length. *Wohlstein v. Aliezer*, 321 S.W.3d 765, 777 n.19 (Tex. App.—Houston [14th Dist.] 2010, no pet.).

27.   Only a transfer of the first type under TEX. BUS. & COM. CODE § 24.005(a)(1) requires consideration of the "badges of fraud" set forth in TEX. BUS. & COM. CODE § 24.005(b).

Plaintiff contends that TransProject made four transfers that satisfy the elements of the three types of fraudulent transfer under TUFTA set out above. *Id.* at 26-41.  Three of the four are alleged to have occurred in February 2017:  the transfer from TransProject to Defendants of (1) long-standing customer accounts UT-Battelle, Delta Fabrication, Evapco, and SPX Cooling; (2) accounts receivable relating to the same four clients; and (3) TransProject's goodwill.  The fourth is alleged to have occurred in September 2016.  This alleged fraudulent transfer is based on the allegation that in order to increase the value of Defendants when being purchased by an equity fund, Defendants transferred to TransProject approximately $400,000 of Defendants' debt.  Dkt. 54 at 30-31.

Defendants dispute whether any of the four transfers alleged by Plaintiff actually occurred.  Defendants do not dispute, for purposes of summary judgment, that they qualify as "insiders" under TUFTA or that TransProject was insolvent at the time of the alleged transfers.  Because Defendants dispute only whether any transfer occurred, they do not argue the alleged transfers were made by TransProject in exchange for reasonably equivalent value.  Thus, to decide the Motion for Summary Judgment as to the alleged fraudulent transfers, the Court need only address whether Plaintiff has presented summary judgment evidence that an asset was transferred from or debt was incurred by TransProject.

**A.1**. **The Court needs additional information to decide the motion regarding the alleged transfer of three customer accounts.**

Plaintiff cites several pieces of evidence in support of its claim that TransProject transferred the customer accounts UT-Battelle, Delta Fabrication, Evapco, and SPX Cooling to one or both Defendants:  the resolution dissolving TransProject (D.Ex. O); the deposition of Angie Santillan (P.Ex. C); and emails reflecting that in January 2017 Santillan requested reports of TransProject's largest customers (P.Ex. 11-14).

It is undisputed that the Members dissolved TransProject as of February 1, 2017 by Written Resolution.  Dkt. 49-2 at 166-67 (D.Ex. O).  The resolution cites several reasons for the company's demise:  that TransProject "failed to make a profit for the years it has been in existence;" the breach of contract by Spinning Star Energy, LLC "caused substantial and devastating losses to the Company;" the Company had significant debt including a judgment in favor of Violet Rose in excess of $1.4 million and more than $530,151 owed to Defendants under their Transportation Services Agreements; the Company was being sued by Cooper T. Smith Stevedoring Services for storage fees; and the Members were unwilling to contribute the additional capital that was necessary to fund ongoing operations.[9]  *Id.* Around the time of TransProject's dissolution, Santillan requested reports listing TransProject's largest customers.  Dkts. 59-16 - 59-19 (P.Exs. 11-14).  These reports indicate that UT-Battelle, Evapco, and SPX Cooling were at one time clients of TransProject.  However, nothing in the resolution of dissolution or the reports cited shows

---

[9] The Written Resolution also represents that "the Company has no work in progress and owns no outstanding accounts receivables."  Dtk. 49-2 at 167. As discussed below, this statement has proven to be inaccurate.

that existing TransProject accounts were transferred to Defendants.

Angie Santillan, Chief Operating Officer for Defendants Transfair and Express and a former Member of TransProject, gave an extensive deposition in October 2019 regarding the nature of TransProject's work and its contractual relationship with Defendants.  Dkt. 59-3; Dkt. 52-1 ¶1.[10]  Santillan testified, among other things, that she and Dearden[11] are signatories on the TransProject bank account; TransProject was not making a profit at the end of its existence; Susan St. Germain was employed by Defendant Transfair before starting to work for TransProject in 2009; St. Germain returned to Transfair in 2017 and was terminated in 2018; UT-Battelle was a TransProject client that later worked with St. Germain at Transfair as well as with St. Germain's own company; and SPX Cooling and Evapco were also TransProject clients that later worked with St. Germain at Transfair after she left TransProject.  Dkt. 59-3 at 20, 31, 41-45.

Santillan also submitted affidavits in support of summary judgment.  Dkt. 49-1; Dkt. 52-1.  Santillan declares in her affidavit testimony that UT-Batelle's existing contract with TransProject was terminated by TransProject when it ceased operations.  Dkt. 52-1 ¶4.  About five months later, UT-Batelle entered into a new contract for heavy lifting projects with Transfair.  *Id.* ¶5.  UT-Batelle subsequently continued working with St. Germain in 2018 when she went to work for a competitor.  *Id.*   In addition, Santillan testified that

---

[10] Plaintiff submitted the entire October 2019 deposition of Santillan as well as those of Dearden (P.Ex. D) and Vernoy (P.Ex. E) and the 2015 depositions of St. Germain (P.Ex. 1) and Santillan (P.Ex. 5) from the Spinning Star lawsuit. The Court is obligated to consider only the portions actually cited by Plaintiff.  "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Ragas v. Tennessee Gas Pipeline, Co.*, 136 F.3d 455, 458 (5th Cir. 1998).
[11] Christine Dearden was a Member of TransProject and CFO of Transfair but is no longer actively involved in the business. Dkt. 59-4 at 7.

Evapco and SPX Cooling also contracted with Transfair for new heavy lift projects after St. Germain returned to that company. *Id.* ¶¶ 8-9. There is no evidence that Delta Fabrications was ever a customer of TransProject. *Id.* ¶6.

The record evidence indicates that St. Germain engaged in the same sort of business for these three clients after returning to the employment of Transfair as she had previously engaged in for TransProject. Defendants represent they are not "in the business of providing shipping services directly to customers. Rather, they provide services to shipping companies." Dkt. 49 at 10 (citing 49-1 at ¶7). Thus, the record raises unanswered questions regarding St. Germain's work for former TransProject clients while employed by Transfair. It is true in general that an employee of a corporation has "the same right to engage in the same business activity when the corporation declares bankruptcy." *Trask v. Susskind*, 376 F.2d 17 (5th Cir. 1967). However, the record here does not include sufficient details regarding the work performed by St. Germain at Transfair for the Court to determine whether St. Germain was merely engaging in her right to continue working for a different company using her skills and contacts, or if these accounts were "transferred" to Transfair.

As noted above, a successful plaintiff must show that each element of a fraudulent transfer is met as to each alleged transfer. *Doyle*, 370 S.W.3d at 453. Plaintiff's briefing and record evidence submitted in this case is confusing and difficult to navigate.[12] While the Court is constrained to exercise caution by denying summary judgment on this claim on

---

[12] In addition to the facts described *supra* at n.2-3, Plaintiff separately filed a supplemental appendix of exhibits (Dkt. 59) that were numbered differently than the exhibits with the supplemental response (Dkt. 54). In addition, Plaintiff filed some exhibits that were never cited in the briefing and filed entire deposition transcripts when only a limited number of pages were cited. In addition, the lengthy brief at times simply refers back to prior arguments instead of explicitly citing supporting evidence.

the current record, it would be a waste of judicial and the parties' resources to allow this case to proceed to trial if  St. Germain's work for former clients of TransProject does not constitute a transfer of those customer accounts as a  matter of law.  Therefore, the Court recommends that Defendants' Motion for Summary Judgment be denied without prejudice as to Plaintiff's fraudulent transfer claim based on the alleged transfer of customer accounts for UT-Batelle, Evapco, and SPX Cooling.  The Court further recommends that Defendants' Motion for Summary Judgment be granted with prejudice as to Plaintiff's fraudulent transfer claim based on the alleged transfer of a customer account for Delta Fabrications.

## A.2    The Court needs additional information to decide the motion regarding the alleged transfer of accounts receivable from two TransProject accounts.

In support of its claim for fraudulent transfer of accounts receivable from TransProject to Defendants, Salvex relies primarily on an "aging report" from May 2017 showing accounts receivable from TransProject customers (P.Ex. 26).  This aging report shows an active account with payments due from Evapco for "SEA13," which refers to TransProject. Dkt. 59-31; Dkt. 52-1 ¶7.  The record evidence also shows one other customer with a receivable outstanding at the time TransProject ceased operations, UT-Batelle.  Dkt 52-1 ¶4.  There is no evidence that SPX Cooling or Delta Fabrications owed receivables to TransProject at the time it ceased operations, and Santillan testified they did not.  Dkt. 52-1 ¶¶ 6, 9.

Santillan states in her Declaration that a shipment for UT-Batelle was underway from Japan when TransProject ceased operations, so Santillan and Transfair facilitated the completion of the shipment.  Dkt 52-1 ¶4.  UT-Batelle paid TransProject's invoice for that

shipment in the amount of $129,059.75 on May 1, 2019 and the accounting system reflects that the payment was credited to TransProject.  Dkt 52-1 ¶4 and pp. 22-25.  Similarly, at the time TransProject ceased operations, five shipments for Evapco were enroute from Asia and Transfair facilitated completion of the shipments. Dkt. 52-1 ¶7.  Evapco paid TransProject's invoices for the shipments at various times in Spring 2017 and the accounting system reflects that the payments were allocated to TransProject's account.  Dkt. 52-1 ¶7 and pp. 44-61; Dkt. 59-31.

The record demonstrates that UT-Batelle and Evapco made payments after TransProject ceased operations that were credited to a TransProject account in Defendants' accounting system.  However, the record does not demonstrate what happened to the money after it was paid to Transfair and credited to TransProject.  The evidence indicates that the money is (or was) held in accounts accessible by Defendants.  *See* Dkt. 59-31; Dkt. 52-1; Dkt. 49-1; Dkt. 59-3 at 31.  For example, if the money is still held in an account for the benefit of TransProject's creditors, it has not been fraudulently transferred as a matter of law and a jury trial on this issue would be a waste of the Court's and the parties' resources.  However, if the money was credited against TransProject's over $500,000 antecedent debt to Defendants, or was otherwise used for Defendants' own purposes, then a fact issue may exist regarding fraudulent transfer under the TUFTA.[13]  To avoid a waste of judicial and

---

[13] TEX. BUS. & COM. CODE § 24.005(a) provides:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

    (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

    (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

        (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

party resources, the record should be supplemented to include the accounting information regarding the use of the payments made on the TransProject receivables for the UT-Batelle and Evapco accounts receivables. Therefore, the Court recommends that Defendants' Motion for Summary Judgment on Plaintiff's fraudulent transfer claims based on the transfer of accounts receivable for UT-Batelle and Evapco be denied without prejudice. The Court further recommends that Defendants' Motion for Summary Judgment as to Plaintiff's fraudulent transfer claims based on the transfer of accounts receivable for SPX Cooling and Delta Fabrications be granted with prejudice due to the absence of any evidence of a transfer of receivables from either entity.

### A.3.    Salvex has not raised an issue of fact regarding transfer of TransProject's good will.

Plaintiff next contends that Defendants fraudulently transferred good will from TransProject by hiring St. Germain as Executive Director of Projects for a Transfair group called Transgroup Projects. Dkt. 54 at 26-27. Good will represents the "advantages accruing to a business on account of its name, location, reputation, and success." *Airflow Houston, Inc. v. Theriot*, 849 S.W.2d 928, 933 (Tex.App.-Houston [1st Dist.] 1993, no writ) (citing *Taormina v. Culicchia*, 355 S.W.2d 569, 574 (Tex. App.—El Paso 1962, writ re'f n.r.e.)). Under certain circumstances it is possible to establish a fraudulent transfer claim

---

(B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

TEX. BUS. & COM. CODE § 24.006(b) provides "a transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent."

[14] Defendants argue it is the general rule that good will cannot be transferred separate and apart from tangible assets. *Trask*, 376 F.2d at 20; *In re Bob Nicholas*, 358 B.R. at 703. But this does not appear to always be the case under Texas law. *see Airflow*, 849 S.W.2d at 933 ("Good will of a business can be transferred apart from any tangible assets."). Still, there can be no dispute that "goodwill" must exist in order to be "transferred."

based on the transfer of good will.  *Airflow Houston*, 849 S.W.2d at 933.  "The question of whether good will does or does not exist is one of fact."  *Id.*

In order to survive summary judgment regarding the alleged transfer of good will, Plaintiff must present evidence to raise a genuine issue of material fact as to whether TransProject good will existed in February 2017.  Generally, good will is extinguished when a business ceases to operate.  *See In re Bob Nicholas Enter., Inc.*, 358 B.R. 693, 703 (Bankr. S.D. Tex. 2007) (it is the general rule that good will is extinguished when a business ceases to operate); *Nail v. Nail*, 486 S.W.2d 761, 763 (Tex.1972) (Once the business ceases to operate, good will is extinguished.).  Furthermore, good will generally does not exist absent a connection to a reasonably profitable business.  *Sanderfur v. Beard*, 249 S.W. 274, 276–277 (Tex.Civ.App.—San Antonio 1923) ("A profitable business may exist unsupported by good will, but good will cannot exist as far as value is concerned unconnected with a reasonably profitable business."); *Taormina v. Culicchia*, 355 S.W.2d 569, 573-74 (Tex.App.—El Paso 1962, writ ref'd n.r.e.) ("The value of the 'good will' of a business depends upon the fixed and favorable consideration of customers arising from an established and well-known and well-conducted business.").[14]

Plaintiff has not met its burden to raise a genuine issue of material fact as to the existence of good will.  TransProject ceased operations as of February 1, 2017.  Dkt. 49-2 at 166-67.  By that time, TransProject had not been a reasonably profitable business for

---

[14] Defendants argue it is the general rule that good will cannot be transferred separate and apart from tangible assets. *Trask*, 376 F.2d at 20; *In re Bob Nicholas*, 358 B.R. at 703. But this does not appear to always be the case under Texas law.  *see Airflow*, 849 S.W.2d at 933 ("Good will of a business can be transferred apart from any tangible assets."). Still, there can be no dispute that "goodwill" must exist in order to be "transferred."

some time, if it ever was.  *See* Dkt. 49-2 at 166-67 ("Whereas, the Company has failed to make a profit for the years it has been in existence and has not returned to the Members the capital they have contributed to the Company"); Dkt. 59-3 at 23 ("if you cumulatively look at the years from inception to conclusion, TransProject ended up with a loss."); Dkt. 49-1 at ¶¶ 18-22.

Plaintiff appears to assume the existence of TransProject good will, but as evidence of the transfer of good will, Plaintiff cites exhibits containing screen shots of web pages showing the similarities between the TransProject website and the Transgroup.com and TransGroup Projects websites.  Dkts. 59-7, 59-8.  However, the appearance of the name "TransProject" on pages in the Transgroup.com website as late as 2019 does not raise a fact issue on the existence of good will or its transfer.  The record contains no evidence that the name "TransProject" carried with it any valuable good will.  Plaintiff has produced no evidence tending to demonstrate that any customer hired Defendants due to seeing TransProject's name on the website or that Defendants gained anything of value from having TransProject's name on webpages within its website.  Finally, nothing in the record demonstrates that any valuable good will was tied to the name "TransProject" separate and apart from the good will associated with the name "Transgroup Worldwide Logistics" and its affiliation with the wider TransGroup family of companies denoted by the prefix "Trans."[15]  The summary judgment record demonstrates only that a few of TransProject's many customers worked with Transfair after TransProject dissolved (UT-Batelle, Evapco,

---

[15] As Santillan testified, Defendants own dozens of trade names and service marks that include the prefix "Trans," such as Trans-Show, TransAviation, TransFilm, TransVine, TransMarine, TransGolf, TransExhibit, and TransWear. Dkt. 49-1 ¶5.

and SPX Cooling, as described above). *See* P.Ex.11 (listing TransProject's largest customers). The fact that three customers contracted or worked with Transfair after TransProject ceased operations fails to create a fact issue in support of the alleged fraudulent transfer of goodwill. *See Trask*, 376 F.2d at 20 (no transfer of goodwill where 50-60% of bankrupt company's customers went to competitors instead of defendant's new company).

These general principals of law and the absence of evidence of the existence of TransProject's good will demonstrate that Plaintiff has failed to meet its summary judgment burden to create a genuine issue of material fact with respect to the fraudulent transfer of good will. Therefore, the Court recommends that Defendants' Motion for Summary Judgment be granted as to Plaintiff's fraudulent transfer claim based on the transfer of good will from TransProject to Defendants.

## A.4    Salvex has not raised an issue of fact regarding the alleged transfer of Transfair's debt to TransProject.

Plaintiff alleges that in September 2016 Defendant Transfair "transferred" approximately $400,000 of its debt to TransProject, contributing to TransProject's insolvency. Dkt. 54 at 26, 36. In support of this claim, Plaintiff relies on a September 2016 email from Dearden to Lous De La Garza, Financial Services Director Transgroup Corporate, stating "once I hear back from Angie later we may need to write off all of the Violet Rose balance which is $410,410.02. Personally I believe this should be 100% written off against TransProjects [sic] since the station did not listen to Angie's advise not to pay this on behalf of Violet Rose." Dkt. 59-40. De La Garza responded simply, "[A]greed." Dkt. 59-57.

16

Dearden discussed her email during her deposition, explaining that the debt she referenced was the debt TransProject incurred "on behalf of Violet Rose" by signing the contract with the stevedoring company for storage of the turbines at the Port of Houston. *See* Dkt. 59-4 at 22-23.  It was Dearden's opinion that because the station failed to follow Santillan's advice to have Spinning Star Energy be responsible for the storage costs, TransProject should bear 100% of the debt due to storage fees, and Transfair should not be held responsible for the usual 11% of the debt under the terms of the TSA.  *Id.*  Dearden explained that she raised the allocation issue because she was "trying to clean our accounts receivable for our October finalization of the sale."  *Id.*  Dearden could not recall how the debt was finally handled "[b]ecause it would have really made no difference."  *Id.*

Plaintiff has not presented any evidence that shows how the debt was in fact handled, or that the debt ever belonged to Transfair and was transferred to TransProject.   The Court concludes that Plaintiff has failed to create a genuine issue of material fact as to whether Transfair fraudulently transferred debt to TransProject in February 2017 and therefore recommends that Defendants' Motion for Summary Judgment be granted on this claim.

### B.  The Conspiracy Claim

The elements of a civil conspiracy claim under Texas law are:  (1) a combination of two or more persons; (2) the persons seek to accomplish an object or course of action; (3) the persons reach a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts are taken in pursuit of the object or course of action; and (5) damages occur as a proximate result.  *First United Pentacostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 222 (Tex. 2017).  Civil conspiracy is a theory of derivative liability. *Agar*

*Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 144 (Tex. 2019), *reh'g denied* (Sept. 6, 2019).  Proof of an underlying tort is required to show a civil conspiracy.  *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996).

Plaintiff alleges Defendants conspired to engage in the fraudulent transfers discussed in Section III.A above.  To the extent a fraudulent transfer claim survives summary judgment, this derivative claim may as well.  Therefore, the Court recommends that Defendants' Motion for Summary Judgment on Plaintiff's conspiracy claim be denied without prejudice pending final ruling on the remaining fraudulent transfer claims

### C.  Alter Ego/Piercing the Corporate Veil Liability

It is a bedrock principle of Texas corporate law that the corporate structure limits an owner's liability for corporate debts.[16]  *SSP Partners v. Gladstrong Investments (USA) Corp.*, 275 S.W.3d 444, 451 n.29 (Tex. 2008) (citing *Willis v. Donnelly*, 199 S.W.3d 262, 271 (Tex. 2006) and *Castleberry v. Branscum*, 721 S.W.2d 270, 271 (Tex. 1986)). "Generally, alter ego will not apply to disregard the corporate form absent exceptional circumstances." *Richard Nugent & CAO, Inc. v. Estate of Ellickson*, 543 S.W.3d 243, 266 (Tex. App.—Houston [14th Dist.] 2018, no pet.).  In determining alter ego status Courts consider whether:  (1) the entities shared common business names, offices, employees, or accounting; (2) one company paid the others' employees; (3) one entity performed services on behalf of the other; (4) one entity made undocumented transfers of funds to the other; (5) there is a clear allocation of profits and losses between the two entities; (6) there was a

---

[16] "Veil-piercing and 'alter ego' principals apply equally to corporations and LLCs."  *Spring Street Partners-IV v. Lam*, 730 F.3d 427, 443 (5th Cir. 2013).

commingling of funds, or one entity paid the debts of another; (7) one entity represented that it would financially back the other; (8) company profits were diverted from one entity to the other; (9) there was inadequate capitalization on one entity; and (10) there were other failures to keep assets separate. *U.S. KingKing, LLC v. Precision Energy Servs., Inc.*, 555 S.W.3d 200, 213-14 (Tex. App. —Houston [1st Dist.] 2009, no pet.); *Tryco Enters., Inc. V. Robinson*, 390 S.W.3d 497, 509 (Tex. App.—Houston [1st Dist.]  2012, pet. dism'd).  In addition, in order to impose alter ego liability Texas law requires "evidence of the kinds of abuse that the corporate structure should not shield, such as fraud, evasion of existing obligations, circumvention of statutes, monopolization, criminal conduct, and the like." *U.S. KingKing, LLC*, 555 S.W.3d at 213.

The Texas Legislature has limited the ability of a plaintiff to recover under an alter ego theory of liability.  The Texas Business Organizations Code precludes a shareholder, owner, or affiliate from being held liable for the corporation's contractual obligations on the basis that the shareholder was the alter ego of the corporation or on the basis of actual or constructive fraud, a sham to perpetrate a fraud, or other similar theory.  TEX. BUS. ORGS. CODE ANN. § 21.223(a)(2); *Doyle*, 370 S.W.3d at 457.  Under Texas law, the only time a shareholder/owner/affiliate loses the statutory protection under § 21.223(a)(2) is if "the obligee demonstrates the [shareholder/owner/affiliate] caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the shareholder." TEX. BUS. ORGS. CODE ANN. § 21.223(b); *Doyle*, 370 S.W.3d at 457.  In addition, "[u]nder section 21.223(a)(3), the failure of a corporation to observe any corporate formality is no longer a factor in considering whether

alter ego exists." *Id.* at 458. "Liability of a shareholder for a contractual corporate obligation that is limited by section 21.223 'is exclusive and preempts any other liability imposed for that obligation under common law or otherwise.'" *Id.*

The Fifth Circuit has held that a fraudulent transfer under TUFTA made with the actual intent to hinder, delay, or defraud, can satisfy the actual fraud requirement of § 21.223(b). *Matter of Ritz*, 832 F.3d 560, 566–67 (5th Cir. 2016). This is because a fraudulent transfer under TUFTA § 24.005(a)(1) "necessarily involves dishonesty of purpose or intent to deceive." *Id.* The Fifth Circuit further explained that "[a]s direct evidence of actual fraud is often scarce, TUFTA "supplies a 'non-exclusive list of eleven factors, commonly known as badges of fraud, that courts may consider in determining whether a debtor actually intended to defraud creditors under TUFTA." *Id.* (citing *Spring Street Partners-IV*, 730 F.3d at 437).

Given the above-cited law, clarity on the issues involved in determining of whether fraudulent transfers of certain customer accounts or accounts receivable occurred will inform the Court's determination of whether Defendants are entitled to summary judgment on Plaintiff's alter ego claim. Therefore, the Court recommends Defendants' Motion for Summary Judgment on Plaintiff's alter ego/piercing the corporate veil claim be denied without prejudice pending further briefing and rulings by the Court.

In addition, the parties assume application of Texas law, including the Texas Business Organizations Act, to all of Plaintiff's claims in this case, and for current purposes the Court does as well. *See* Dkt. 49, 54, 58. However, in the next round of briefing, the parties should expressly and clearly set forth their arguments regarding the applicability of

any provision of § 21.223 and the interaction of that section with the *U.S. KingKing* factors used to assess alter ego/veil piercing liability.

### D.     Joint Business Enterprise

Plaintiff argues Defendants are liable for the TransProject judgment under a joint business enterprise theory because Defendants joined with TransProject on the Spinning Star venture and/or the sale of the turbines.[17]   *See* Dkt. 54 at 52-53.   "Joint business enterprise" is not a cause of action but a theory of vicarious liability.  *See Aluminum Chems. (Bolivia), Inc. v. Bechtel Corp.*, 28 S.W.3d 64, 67 (Tex. App.—Texarkana 2000, no pet.) (holding that "joint business enterprise" is not a cause of action but a theory of liability that permits one party to be held liable for the negligent acts of another); *Seureau v. ExxonMobil Corp.*, 274 S.W.3d 206, 218 (Tex. App. —Houston [14th Dist.] 2008, no pet.) ("Generally, the theory of joint enterprise imputes liability to one who did not do wrong, but who is so closely connected to an active wrongdoer as to justify the imposition of vicarious liability."). To establish a joint enterprise a plaintiff must show: (1) an agreement among members; (2) a common purpose; (3) a "community of pecuniary interest"; and (4) an equal right to control the enterprise.  *Aluminum Chems.*, 28 S.W.3d at 67 (citing *Blount v. Bordens, Inc.*, 910 S.W.2d 931, 933 (Tex. 1995)).  Plaintiff has not provided summary judgment evidence raising a fact issue on these elements.

---

[17] Defendant argues that Plaintiff's joint business enterprise claim must be dismissed because Plaintiff has not asserted a negligence claim against Defendants and TransProject was not found liable for negligence in the Violet Rose lawsuit. Dkt. 49 at 29-30.  Plaintiff responds that the joint business enterprise theory applies not just to negligence but also to an intentional tort such as fraud.  Dkt. 54 at 50.  Plaintiff's argument misses the mark because there are also no allegations in this case that Defendants committed fraud or another intentional tort in connection with the Spinning Star venture or the sale of the turbines.  *See* Dkt. 10.

Instead, the evidence submitted by Plaintiff seems to go to the issue of whether Defendants and TransProject operated as a single business enterprise, a theory not to be confused with the joint business enterprise theory. In *SSP Partners v. Gladstrong Investments (USA) Corp.*, 275 S.W.3d 444, 451-52 (Tex. 2008), the Texas Supreme Court discussed the distinction between joint enterprise, alter ego/veil piercing, and single business enterprise theories: joint enterprise requires proof of the four elements identified in *Aluminum Chems.*; alter ego requires proof of the intwined relationship between the corporate entities plus an illegitimate purpose; and single business enterprise "does not entail the level of agreement required for joint enterprise liability or the abuse required before the law disregards the corporate structure to impose liability" under alter ego. The Texas Supreme Court went on to reject the single business enterprise theory as a means to disregard the corporate structure, adding that the theory is "fundamentally inconsistent with the approach taken by the [Texas] Legislature in [the Texas Business Organizations Code.]" *Id.* at 455. The Texas Supreme Court further affirmed that disregarding the corporate structure under Texas law requires proof of two things: the close relationship between two entities, **and** "whether the entities' use of limited liability was illegitimate." *Id.* Because joint business enterprise liability, like single business enterprise liability, does not entail the second required element, *SSP Partners* dictates that Plaintiff cannot use joint business enterprise as an alternative method of piercing the corporate veil to recover payment of the TransProject judgment from Defendants. Therefore, the Court recommends that Defendants' Motion for Summary Judgment on Plaintiff's joint business enterprise claim be granted.

### IV.   Conclusion, Recommendations, and Orders

For the reasons set forth above, the Court RECOMMENDS Defendants' Motion for Summary Judgment (Dkt. 49) be:

- GRANTED WITH PREJUDICE as to Plaintiff's claims for fraudulent transfer of (i) the account of Delta Fabrications; (ii) the accounts receivable of Delta Fabrications and SPX Cooling; (iii) good will of TransProject; and (iv) debt from Defendants to TransProject;

- DENIED WITHOUT PREJUDICE as to Plaintiff's claims for fraudulent transfer of (i) accounts of SPX Cooling; UT-Batelle; and Evapco; and (ii) accounts receivable of Ut-Batelle and Evapco;

- DENIED WITHOUT PREJUDICE on Plaintiff's conspiracy claim based on the surviving allegations of fraudulent transfer;

- DENIED WITHOUT PREJUDICE as to Plaintiff's alter ego/piercing the corporate veil claim; and

- GRANTED WITH PREJUDICE as to Plaintiff's Joint Business Enterprise claim.

The Clerk of the Court shall send copies of the memorandum and recommendation to the respective parties, who will then have fourteen days to file written objections, pursuant to 28 U.S.C. § 636(b)(1)(c).  Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc), superseded by statute on other grounds.

It is further ORDERED that Defendant shall file a Second Motion for Summary

23

Judgment only as to the surviving fraudulent transfer and veil piercing claims within 30 days of entry of an Order adopting this Memorandum and Recommendation.  Plaintiff shall file a Response within 21 days thereafter, responding only to the surviving claims. Defendant may file a Reply 14 days after the Response, and Plaintiff may file a Sur-reply 7 days after the Reply.  It is further

ORDERED that the Motion and Response are limited to 25 pages and the Reply and Sur-reply are limited to 15 pages.  Each exhibit shall be filed on the docket separately as an attachment to the main document.  Only evidence actually cited by a party in its briefing will be considered by the Court.  Only excerpts from depositions cited by a party, not the entire transcript, shall be filed as exhibits.  All evidence must be cited directly in connection with the fact or element of the claim in support of which it is submitted, and parties are not to refer the Court to other parts of the briefing to find supporting evidence.  If necessary, the Court will set oral argument upon conclusion of the briefing.

 Signed on August 12, 2020, at Houston, Texas.

Christina A. Bryan
United States Magistrate Judge