United States District Court
Southern District of Texas

**ENTERED**

August 02, 2021

Nathan Ochsner, Clerk

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| SALVEX, INC., | § | |
| *Plaintiff,* | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 4:18-cv-1175 |
| | § | |
| TRANSFAIR NORTH AMERICA INTERNATIONAL | § | |
| FREIGHT SERVICES, INC. ET AL., | § | |
| *Defendants.* | § | |

## <u>MEMORANDUM AND RECOMMENDATION</u>

This case is before the Court on Defendants' Second Motion for Summary Judgment. ECF 70.[1] Having considered the parties' submissions, arguments of counsel at a video hearing on June 29, 2021, and the law, the Court recommends that Defendants' Second Motion for Summary Judgment be granted and Plaintiff's claims be dismissed with prejudice.

## I.      Background

Plaintiff Salvex, Inc.'s predecessor in interest, Violet Rose Holdings, Ltd., initiated this case to collect on a judgment Violet Rose obtained against TransProject, LLC. TransProject, which operated a shipping and logistics business, was a Texas Limited Liability Company formed in 2009 by members Greg Vernoy (49%), Christine Dearden (21%), Susan St. Germain (25%) and Angie Santillan (5%). Defendants Transfair North

---

[1] The District Court referred this case to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. ECF 61.

America International Freight Services, LLC d/b/a Transgroup International (Transfair)[2] and Transgroup Express, LLC (Express)[3] entered into contracts called Transportation Services Agreements (TSAs) with many companies, including TransProject.  In accordance with its TSAs, Transfair and Express provided back office services such as accounting, vendor payables and collections, and information technology and software solutions. Defendants Transfair and Express refer to shipping companies with which they have Transportation Services Agreements as "stations."  Defendants contract with approximately 90 stations around the world, some of which are affiliated with Defendants' owner, TransGroup Global, Inc., and some of which are not.

In September 2011, TransProject entered into an agreement to provide transportation and shipping logistics for a Chinese/American joint venture, Spinning Star Energy, LLC, in connection with what was supposed to be a billion-dollar wind energy project in East Texas. TransProject expected the work to involve the importation of hundreds of massive wind turbines from China and the transportation of the turbines from the free trade zone at the Port of Houston to the project site in East Texas.  Spinning Star shipped twelve turbines before the project fell through, allegedly due to massive fraud by Spinning Star.

In connection with its work for Spinning Star and on the promise that Spinning Star

---

[2] Transfair was formed as a corporation in Washington State in 1986 by shareholders including Vernoy and Dearden who became sole shareholders in 2007.  It was sold to an equity fund in September 2016 and converted to an LLC. TransGroup Global, Inc. holds 100% of the membership units.  Vernoy and Dearden own minority interests in TransGroup Global, Inc.  Vernoy is CEO of Transfair

[3] Transgroup Express, Inc. was formed in Washington State in 1989 by shareholders Vernoy, Dearden, and Ron Lee. It was sold to an equity fund in September 2016 and converted to an LLC.  TransGroup Global, Inc. holds 100% of the membership units.  Vernoy, Dearden, and Lee own minority interests in TransGroup Global, Inc.  Lee is President of Transgroup Express.

would reimburse TransProject for the costs, TransProject signed a contract with a stevedoring company for storage of the twelve turbines.  After the project fell through, the turbines remained in storage in the free trade zone at the Port of Houston.  TransProject was unable to continue paying the ongoing storage fees, and because the stevedoring company had not received payment for the overdue fees, it began holding cargo belonging to TransProject's other shipping customers, effectively eliminating TransProject's ability to move cargo through the Port of Houston.  Faced with this situation, TransProject hired Salvex to auction the twelve turbines being held in storage.  The winning bidder at the auction had funding difficulties and assigned its rights in the turbines to Violet Rose Holdings, Ltd.  After receiving funds from the auction of the turbines in January 2014, Salvex wired $720,000 to TransProject's account and retained approximately $400,000 as its commission on the sale.  TransProject used the sale proceeds to reimburse Transfair for the turbine storage fees Transfair had advanced and held the remaining funds in an account pending determination of the rightful owner.

Spinning Star sued TransProject for improperly selling the turbines.  Because Violet Rose was unable to obtain good title to the turbines, it joined the lawsuit against TransProject and sought a return of its purchase price.  In December 2016 Violet Rose obtained a judgment against TransProject for an amount in excess of $1 million (TransProject Judgment).  In February 2017, TransProject paid to counsel for Violet Rose at least $369.240.15 of the remaining funds from the sales proceeds it had been holding in an account but has made no further payments on the TransProject Judgment.

The Members of TransProject dissolved the company in February 2017.  Violet Rose

sued Defendants in state court alleging they are responsible to pay the TransProject Judgment based on alter ego liability and fraudulent transfers that had been made from TransProject to Defendants.[4]  *See* ECF 1-3.  Defendants removed the case to this Court based on diversity jurisdiction.  Violet Rose filed a First Amended Complaint asserting causes of action for fraudulent transfer, conspiracy, alter ego/piercing the corporate veil, and joint business enterprise liability.  ECF 10.

Violet Rose sued Salvex in a separate lawsuit.  Violet Rose and Salvex entered into a settlement that included Violet Rose assigning its claims against Defendants in this lawsuit to Salvex.  Accordingly, the Court substituted Salvex for Violet Rose as Plaintiff in this case.  ECF 19.

The Court granted in part and denied in part Defendants' first Motion for Summary Judgment (ECF 49) and granted Defendant leave to file a second motion for summary judgment as to the surviving claims.  ECF 65.  Currently before the Court is Defendants' Second Motion for Summary Judgment on Plaintiffs' claims for (1) fraudulent transfer of the customer accounts of UT-Batelle, Evapco, and SPX Cooling; (2) fraudulent transfer of accounts receivables from UT-Batelle and Evapco; (3) conspiracy to engage in fraudulent transfers; and (4) alter ego/piercing the corporate veil.  At this point, the Court has twice reviewed Plaintiff's evidence submitted in support of its claims and finds the evidence fails to create a genuine issue of material fact as to fraudulent conduct by Defendants.

---

[4] Trans IAH, LLC was also named as a defendant but has since been dismissed.  ECF 18.

## II.   Summary Judgment Standards

Summary judgment is appropriate if no genuine issues of material fact exist, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The party moving for summary judgment has the initial burden to prove there are no genuine issues of material fact for trial.  *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001).  Dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the nonmoving party.  *Hyatt v. Thomas*, 843 F.3d 172, 177 (5th Cir. 2016).  "An issue is material if its resolution could affect the outcome of the action." *Terrebonne Parish Sch. Bd. v. Columbia Gulf Transmission Co.*, 290 F.3d 303, 310 (5th Cir. 2002).  The court construes the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor.  *R.L. Inv. Prop., LLC v. Hamm*, 715 F.3d 145, 149 (5th Cir. 2013).  The party opposing summary judgment "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  *Id.*

## III.   Analysis

### A.  Fraudulent Transfer

The party asserting a fraudulent transfer claim bears the burden of proof.  *Matter of Galaz*, 850 F.3d 800, 804 (5th Cir. 2017) (judgment creditor has burden to prove fraudulent transfer by a preponderance of evidence).  The Plaintiff must prove *all* elements of a fraudulent transfer as to *each* alleged transfer at issue.  *Doyle v. Kontemporary Builders, Inc.*, 370 S.W.3d 448, 453 (Tex. App.—Dallas 2012, pet. denied) (emphasis added); *Spring*

*St. Partners-IV v. Lam*, 730 F.3d 427, 436 (5th Cir. 2013).   A successful claim for a fraudulent transfer under the Texas Fraudulent Transfer Act (TUFTA) involves (1) a finding that a debtor committed an actual fraudulent transfer or a constructive fraudulent transfer; and (2) recovery of the value of the transfer from the transferees.   *Id.*

Plaintiff alleges three types of fraudulent transfers in this case: (1) a transfer or obligation made with the actual intent to hinder, delay, or defraud creditors under TEX. BUS. & COM. CODE § 24.005(a)(1); (2) a transfer made by the debtor while it was insolvent for which it did not receive a reasonably equivalent value in exchange under TEX. BUS. & COM. CODE § 24.005(a)(2); and (3) a transfer made while insolvent to an insider for an antecedent debt under TEX. BUS. & COM. CODE § 24.006.[5]   Only a transfer of the first type under TEX. BUS. & COM. CODE § 24.005(a)(1) involves consideration of the "badges of fraud" set forth in TEX. BUS. & COM. CODE § 24.005(b).[6]

> ### A.1   Plaintiff has failed to meet its burden to demonstrate a fraudulent transfer of the UT-Batelle, Evapco, or SPX Cooling Accounts from TransProject to Defendants.

This Court previously denied without prejudice Defendants' motion for summary judgment on Plaintiff's claims that Defendants received fraudulent transfers from

---

[5] As Defendants point out (ECF 75 at 6 n.3), Plaintiff did not plead that TransProject fraudulently transferred money or assets to an insider under TUFTA § 24.006.  *See* ECF 10, ¶ 15.  Nonetheless, the Court has considered the merits of Plaintiff's § 24.006 claim raised in its summary judgment Responses.

[6] The TUFTA badges of fraud are: (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer or obligation was concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.  TEX. BUS. & COM. CODE § 24.005(b).

TransProject of its UT-Batelle, Evapco, and SPX Cooling accounts.  ECF 65 at 11.  As ordered, Defendants submitted a supplemental Declaration from Angie Santillan further explaining the relationship between Susan St. Germain and Defendants and the work Defendants' performed for UT-Batelle, Evapco, and SPX Cooling.  ECF 70-1.[7]  St. Germain was an expert in heavylift logistics and TransProject was created specifically "to penetrate this niche market."  *Id.* at ¶ 3.  As co-founder and an owner of TransProject, St. Germain was paid an owner's draw, not a salary, from TransProject's bank account.  *Id.*  St. Germain stopped receiving a draw when TransProject was dissolved in February 2017.  *Id.*   After TransProject dissolved, Defendant Transfair hired St. Germaine as an employee and paid her a salary from Transfair's account.  *Id.* at ¶ 4.  Transfair and St. Germaine did not have any agreement regarding St. Germaine bringing customer business with her to Transfair. *Id.*  St. Germain left Transfair for an unrelated competitor after 18 months.  *Id.*

*UT-Batelle account.*  UT-Batelle and TransProject executed a Basic Ordering Agreement (BOA) in April 2013.  *Id.* at ¶ 7.  TransProject terminated the BOA effective March 1, 2017.  *Id.* at ¶ 8.  After that, TransProject's relationship with UT-Batelle was limited to completion of a shipment in progress.  Transfair, on behalf of TransProject, issued an invoice to UT-Batelle on April 12, 2017 and UT-Batelle paid the invoice on May 1, 2017. *Id.* at ¶ 9.  Approximately six months after TransProject dissolved and terminated the UT-

---

[7] Also before the Court is Plaintiff's Motion to Strike the Santillan Affidavit. ECF 71.  The Court has issued a separate Order denying the Motion to Strike except as to the statement in paragraph 10— "presumably because they were familiar with her expertise in the heavy logistics niche,"—which Defendants agree is speculative.  Otherwise, the Declaration is made on personal knowledge, is not impermissible hearsay, and the exhibits are properly authenticated. Most of Plaintiff's objections merely argue the exhibits are not dispositive, which is not a valid objection to their admissibility.

Batelle BOA, and approximately four months after TransProject issued the April 2017 invoice, Transfair entered into a BOA with UT-Batelle to provide heavylift logistics services. *Id.* at ¶ 10.

These facts are uncontroverted and do not support a claim for fraudulent transfer of the UT-Batelle account from TransProject to Defendants. These facts demonstrate that after the dissolution of TransProject, of which she was a part owner, St. Germain went to work as an employee for Transfair. UT-Batelle followed St. Germain and chose to enter into a contract with her new employer, Transfair. UT-Batelle exercised its right to do business with an employee and entity of its choosing. The fact that UT -Batelle chose to contract with Transfair and continue to utilize St. Germain's expertise in heavy logistics does not support Plaintiff's claim that TransProject fraudulently "transferred" its account or contractual relationship with UT-Batelle to Defendants. *See* ECF 72-20, 72-21, 72-42.

***Evapco account.*** TransProject performed services for Evapco under account number EVA113. ECF 70-1 at ¶ 12. Nothing in the record demonstrates that TransProject had a written contract with Evapco. At the time TransProject dissolved, six shipments of Evapco's freight were in the process of being shipped from Asia. *Id.* at ¶ 13. The shipments cleared customs in February and March 2017. *Id.* Transfair, on behalf of TransProject, issued invoices to Evapco which Evapco paid between February and October 2017. This was the last work performed under account EVA113. *Id.*

Shortly after TransProject dissolved, Evapco contacted St. Germaine, who had been its main contact person at TransProject, about a new shipment of heavy materials from Vietnam. *Id.* at ¶ 14. Transfair opened a new Evapco account, EVA114, and Transfair

issued invoices for services to Evapco on April 13-14, 2017. *Id.* These facts are uncontroverted and do not demonstrate a fraudulent transfer. As with the UT-Batelle account, Plaintiff's evidence demonstrates that Evapco followed St. Germain to her new employer, Transfair. Plaintiff's evidence does not demonstrate that TransProject fraudulently "transferred" the Evapco account or its contractual relationship with Evapco to Defendants for any purpose. *See* ECF 72-20, 72-21, 72-42.

*SPX Cooling account.* TransProject provided services to SPX Cooling for the last time in 2016. ECF 70-1 at ¶ 17. SPX did not have an active account with TransProject at the time TransProject dissolved in 2017. *Id.* Other related SPX companies have been long-standing customers of other Transfair stations. *Id.* at ¶ 16. In May 2017, SPX Cooling contacted St. Germaine at Transfair for assistance moving several two-ton fan blades. *Id.* at ¶ 18. Transfair created an account for SPX, performed the services, and invoiced SPX in July 2017. *Id.* The record does not reflect an ongoing relationship between SPX Cooling and Transfair. These facts are uncontroverted, and as with the other two accounts, demonstrate that a former customer of TransProject contacted St. Germaine after she began working as an employee of Transfair. These facts do not demonstrate a fraudulent transfer of the SPX Cooling account, which was not active at the time of dissolution, from TransProject to Defendants for any purpose. *See* ECF 72-20, 72-21, 72-42.

In sum, the record does not support Plaintiff's allegations that TransProject transferred its accounts for UT-Batelle, Evapco, and SPX Cooling to Defendants. To prove a fraudulent transfer claim under TUFTA a creditor must show the debtor made a "transfer" of an "asset." *See In re Northstar Offshore Grp., LLC*, 616 B.R. 695, 734 (Bankr. S.D. Tex.

2020); *In re SMTC Mfg. of Texas*, 421 B.R. 251, 280 (Bankr. W.D. Tex. 2009).  TUFTA defines "transfer" as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance."  TEX. BUS. & COM. CODE § 24.002(12).  In common usage, a "transfer" is "the passing of a thing or of property from one person to another."  *See* https://thelawdictionary.org/transfer-n/ (last visited July 20, 2021); https://www.merriam-webster.com/dictionary/transfer ("to convey from one person, place, or situation to another") (last visited July 20, 2021).  The decision by former TransProject customers to do business with Transfair and its employee St. Germain does not meet the definition of a transfer of assets by TransProject to Defendants.  Because Plaintiff has failed to create a material issue of disputed fact regarding the transfer of any customer account by TransProject to Defendants, the Court recommends Defendants' Motion for Summary Judgment on Plaintiff's claims for fraudulent transfer of customer accounts be granted.

> ### A.2    Plaintiff has failed to meet its burden to demonstrate a fraudulent transfer of accounts receivable to Defendants.

This Court previously denied Defendants' motion for summary judgment on Plaintiff's claims that Defendants fraudulently transferred TransProject accounts receivables for UT-Batelle and Evapco without prejudice to Defendants' submission of additional accounting information showing how the payments made by UT-Batelle and Evapco were used.  ECF 65 at 13.  Defendants have submitted additional accounting information for the Court's consideration.  *See* ECF 70-1.

*Accounting procedures between TransProject and Transfair.*  Pursuant to the TSA between Transfair and TransProject, when TransProject was hired by a customer to move freight, TransProject hired the carrier and other necessary vendors to perform the work and sent a "recap" of these costs to Transfair.  ECF 70-1 at ¶ 21.  Transfair then paid the charges of the carrier and other vendors and also advanced a commission to TransProject.  *Id.*  When the customer eventually paid TransProject's invoice for the moving of the freight, the money was credited to TransProject's account.  Once credited to TransProject's account, the funds were first allocated to reimburse Transfair for the costs and commission payment Transfair had advanced.  Next, Transfair kept an amount for its contractual fee as set forth in the TSA.  Any remaining funds from the customer payment were profit for TransProject. *Id.*

As previously stated, at the time TransProject dissolved, UT-Batelle had a shipment in progress with TransProject.  *Id.* at ¶ 9.  Per the TSA and on behalf of TransProject, Transfair paid the carrier and other vendors a total of $117,911.51 and advanced to TransProject a commission of $7,826.55.  *Id.* at ¶ 22.  Also per the TSA, TransProject owed Transfair a fee of $3,530.77.  *Id.*  UT-Batelle made a payment of $129,059.75 on May 1, 2017 which was credited to TransProject's account.  *Id.* at ¶ 9.  Then, funds were transferred to Transfair to reimburse Transfair for (1) the $117,911.51 Transfair had paid to the carriers and vendors for the shipment; (2) the $7,826.55 commission Transfair had advanced to TransProject; and (3) the $3,530.77 fee owed by TransProject to Transfair pursuant to the terms of the TSA.  *Id.* at ¶ 22.

Also as previously stated, at the time TransProject dissolved Evapco had six shipments in progress with TransProject.  The payments received from Evapco were allocated in the same manner described above.  The amounts transferred are set forth in Defendants' Second Motion, ECF 70 at 11, and in Santillan's Declaration, ECF 70-1 at ¶¶ 24-25.  Not only did the payment from Evapco fail to provide any profit to TransProject, it failed to cover the contractual fee due to Transfair.  *Id.*

**_Plaintiff cannot satisfy the elements of TUFTA._**  Plaintiff has failed to raise a genuine issue of material fact regarding the alleged fraudulent transfer of accounts receivables from UT-Batelle or Evapco.  First, Plaintiff's claims under TUFTA fail because the uncontroverted evidence shows that payments to Defendants from the accounts receivables for UT-Batelle and Evapco were made in exchange for reasonably equivalent value (the advanced costs and commissions owed) in the regular course of winding down TransProject's business.[8]  In short, the evidence submitted by Defendants shows that with respect to UT-Batelle, once Transfair had been reimbursed for the advanced costs and commissions, along with its contractual fee, there were no funds available to be recognized as profit by TransProject.  Plaintiff has not controverted this evidence.  Likewise, with respect to the Evapco receivable, Plaintiff has not controverted Defendants' evidence demonstrating that not only was there no profit remaining for TransProject from the

---

[8] Plaintiff argues that Defendants waived any right to argue that they gave reasonably equivalent value or that they are not insiders because those were not the bases for its initial motion for summary judgment.  The Court denied summary judgment as to certain claims without prejudice and granted Defendants leave to file a second motion for summary judgment as to the specific claims that remained.  The Court did not limit the arguments either side could make as to those specific claims.  The Court finds no waiver under these circumstances.

receivable, Transfair did not recover the full amount of the advanced costs and the fees it was due.

Under these circumstances, there is no basis to set aside the transfers as fraudulent. *See* TEX. BUS. & COM. CODE ANN. § 24.009(a) ("A transfer or obligation is not voidable under Section 24.005(a)(1) of this code against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or oblige"). This is true even if Defendants are "insiders" as defined by TUFTA because a "transfer is not voidable under Section 24.006(b) of this code . . . if made in the ordinary course of business or financial affairs of the debtor and the insider." [9] TEX. BUS. & COM. CODE § 24.009(f). The transfers of funds from the UT-Batelle and Evapco payments to reimburse Transfair for costs advanced or commissions due under the TSA constitute transfers for reasonably equivalent value and are not voidable as a fraudulent transfer under Sections 24.005(a)(1), 24.005(a)(2), or 24.006(b).

Plaintiff cites *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 565 (Tex. 2016) in support of its argument that the funds from the Evapco and UT-Batelle receivables were not exchanged for reasonably equivalent value because Defendants did not "provide consideration of objective value at the time of the transaction." ECF 72 at 19. Yet, both

---

[9] "Insider" is defined at TEX. BUS. & COM. CODE § 24.002(7). The evidence shows that neither Defendant has ever been a director, officer, or partner of TransProject. Plaintiff argues Defendants were "person[s] in control of the debtor" under § 24.002(7)(B)(iii). In support of this argument, Plaintiff's counsel represented at the June 29, 2021 hearing that Santillan testified that Transfair operated TransProject as a wholly owned subsidiary. The Court granted counsel leave to submit a record citation to support this representation. Plaintiff submitted citations to Santillan's deposition testimony that Transfair provided some HR and payroll services for TransProject that were "value added" to the TSA. ECF 82 at 5. Plaintiff also submitted a September 2016 email from Christine Dearden, a Member of TransProject and a TransGroup employee, to Luis De La Garza, a TransGroup employee, discussing the possible need to "write off" the Violet Rose balance against TransProject's account. *Id.* Neither is evidence that Defendants "were in control" of TransProject.

*Janvey* and the TUTFA recognize that satisfaction of an antecedent debt can constitute reasonably equivalent value.  TEX. BUS. & COM. CODE § 24.004(a); *Janvey*, 487 S.W.3d at 576 ("the definition of value expressly includes a transfer made to satisfy an antecedent debt, even though satisfaction of the debt would deplete estate assets that might otherwise have been available for the benefit of creditors.").

Furthermore, under TUFTA § 24.005(a)(1), Plaintiff must prove that a transfer was made with the actual intent to hinder, delay, or defraud creditors.  At the summary judgment hearing, Plaintiff represented to the Court that its best evidence of fraud consists of:  (1) an August 22, 2017 email from St. Germain to Henrik Li in China which demonstrates that TransProject continued to operate after February 2017; and (2) the fact that the members of TransProject failed to take steps under Texas law to formalize the dissolution of TransProject after they executed the document titled "TransProject, LLC Action by Written Consent of Members in Lieu of Meeting" (stating that TransProject "shall cease  operations effective as [of] February 1, 2017" and "shall be dissolved immediately").  ECF 49-2 at 166-68.

The August 22, 2017 email exchange between St. Germain and Henrik Li, who self-identified as an employee of "TransProject/China," does not demonstrate that TransProject continued to operate after February 2017 and does not demonstrate intent by the Defendants to defraud TransProject's creditors.  *See* ECF 73-44 at DEFS_019752-55.  Li wrote to St. Germain expressing concern about a reorganization and his potential employment with "Scan"-an entity that has not been part of this suit.  St. Germain responded to Li's concerns and stated "SGL already pays your salary due to the needed structure in China.  They deduct

it from the [TransProject] bank account, which will be closed after audits are completed." *Id.* at DEFS_019753.  Plaintiff insists this statement evidences that TransProject did not actually dissolve in February 2017 and instead continued operating.  The Court finds this email fails to create a fact issue that TransProject continued to operate after February 2017. The email states that Li's salary is being paid by "SGL," and does not show any fraudulent transfer of funds from TransProject to Defendants.

As for the Members' failure to perform the statutory steps to dissolve TransProject, Plaintiff cites no authority holding that such a failure perpetrates a fraud on creditors.  The failure to comply with formal dissolution steps does not, as Plaintiff argues, evidence that TransProject continued to operate and generate revenue that was withheld from TransProject creditors.  Because Plaintiff has failed to raise a genuine issue of material fact with respect to the fraudulent transfer of accounts receivable from UT-Batelle and Evapco, the Court recommends that Defendants' Motion for Summary Judgment be granted on these claims.

### A.3.   Defendants are Entitled to Summary Judgment on Plaintiff's "New" Fraudulent Transfer Allegation

In response to Defendants' Second Motion for Summary Judgment Plaintiff argues that Defendants' motion does not address its claim for fraudulent transfer of proceeds from the sale of the turbines in January 2014.  *See* ECF 72 at 6.  Defendants argue that Plaintiff has never asserted such a claim,[10] that any such claim is time-barred because this suit was

---

[10] Defendants initially moved for summary judgment on all of Plaintiff's fraudulent transfer claims in part because Plaintiff failed to identify "any specific allegedly fraudulent transfer."  ECF 49 at 18-19.  In response, Plaintiff identified four allegedly fraudulent transfers: (1) customer accounts; (2) accounts receivables; (3) corporate good will; and (4) debt.  Plaintiff did not assert or allege a fraudulent transfer of the auction sale proceeds.  ECF 54 at 3, 30.

filed more than four years after the sale of the turbines and more than one year after the last transfer of the sale proceeds; and that there was no fraudulent transfer.

TUFTA § 24.010 provides that claims must be brought under § 24.005(a)(1) within 4 years of the transfer or 1 year of discovery of the transfer; under § 24.005(a)(2) or § 24.006(a) within 4 years of the transfer; and under § 24.006(b) within 1 year of the transfer. TEX. BUS. & COMM. CODE § 24.010. Violet Rose brought this lawsuit in March 2018, more than four years after Salvex wired Defendants money from the sale of the turbines in January 2014, and more than one year after Defendants wired sales proceeds to Violet Rose' counsel in partial satisfaction of the TransProject Judgment. This evidence demonstrates that Violet Rose was aware of all facts underlying Salvex's "new" fraudulent transfer claim by at least February 2017.[11] Thus, even under the "discovery rule" incorporated into the § 24.010 statute of repose for § 24.005(a)(1) claims,[12] Plaintiff's fraudulent transfer claim is untimely.

In addition, Plaintiff has presented no evidence to support its claim. Plaintiff's counsel clarified at the June 29, 2021 hearing that it is not alleging fraudulent transfer to

---

Plaintiff contends that even though it never filed an amended complaint to include this claim, Defendants were informed of the substance of the claim by Plaintiff's motion for continuance filed on May 27, 2019. ECF 25. The reference in the motion for continuance was vague at best. *See id.* Nonetheless, the Court's recommendation does not rest solely on the failure to timely plead the claim. Rather, the Court's recommendation rests on the statute of repose and Plaintiff's failure to present evidence in support of this claim.

[11] As Salvex acknowledged when it asked to substituted as the Plaintiff in this case, Salvex has no greater rights than those possessed by Violet Rose. *See* ECF 17 at 3 ("[S]ubstution under Rule 25(c) does not ordinarily alter the substantive rights of parties but is merely a procedural devise [sic] designed to facilitate the conduct of a case . . .").

[12] Section 24.010 is a statute of repose, not a statute of limitations. *Nathan v. Whittington*, 408 S.W.3d 870, 874 (Tex. 2013) (Section 24.010 "is a statute of repose, rather than a statute of limitations. By its own terms, the provision does not just procedurally bar an untimely claim, it substantively 'extinguishes' the cause of action."). Section 24.010 provides that a claim under § 24.005(a)(1) is extinguished one-year after the creditor reasonably could have discovered the fraudulent nature of the transfer. *See Biliouris as next friend of Biliouris v. Patman*, 751 F. App'x 603, 605 (5th Cir. 2019).

16

Transfair of approximately $320,000 for reimbursement of turbine storage fees (which Tranfair paid on TransProject's behalf).  Rather, Plaintiff argues only that Transfair's retention of the remaining sale proceeds was fraudulent.  At the hearing, counsel for the Defendants represented that to his knowledge, the remaining sale funds were paid to counsel for Violet Rose in partial satisfaction of the TransProject Judgment.  Without objection from Plaintiff, the Court instructed Defendants to supplement the record to include documentation of the payment made to Violet Rose's counsel in partial satisfaction of the TransProject Judgment.[13]   Defendants submitted a February 7, 2017 Outgoing Wire Transfer Advice showing a wire of $369,240.15 to Denton US LLP, counsel for Violet Rose, in "[p]artial satisfaction of judgment Transfair/Spinning Star."  ECF 81.

Plaintiff argues that this evidence creates a fact issue regarding a fraudulent transfer because the payment of approximately $320,000 for storage fees and the $369,240.15 payment to Violet Rose's counsel, evidenced by the Wire Transfer Advice, do not total the amount TransProject received from the sale of the turbines, which has been identified as either $745,000 or $720,000.[14]  Plaintiff makes much of the fact that the "numbers do not add up" because the evidence presented by Defendant fails to account for $57,931.10 of the

---

[13] Plaintiff now objects to Defendants' supplementary filing as outside the summary judgment record and beyond the scope of what the Court requested from Defendants.  See ECF 82.  First, the Court notes that this fraudulent transfer allegation was not clearly articulated by Plaintiff prior to the hearing, giving rise to the need for supplementation.  In addition, the Affidavit of Counsel merely provides citations to Santillan's testimony submitted with its first motion for summary judgment.  The other supplemental information merely confirms that the Wire Transfer Advice was produced to Plaintiff during discovery.  See ECF 81.  Plaintiff's objections are overruled.

[14] The record contains conflicting testimony regarding the exact amounts received from the sale of the turbines and the exact amount paid toward partial satisfaction of the TransProject Judgment.  For example, Angie Santillan stated in a Declaration that after receiving $720,000 from the sale of the turbines, TransProject reimbursed Transfair $317,828.75 for storage costs Transfair had paid and put the remaining approximately $400,000 toward satisfaction of Violet Rose's TransProject Judgment.  ECF 49 at ¶¶ 23-27.  However, Plaintiff cites Santillan's deposition testimony that Transfair received two wire transfers from Salvex in the total amount of $745,000.  ECF 82 at 4 (citing ECF No. 72-4, Santillan Depo. at 91-92).  The conflict in this evidence is not material to the fraudulent transfer claim.

$745,000 Plaintiff contends TransProject received.  ECF 82 at 4.  Plaintiff's argument wrongly attempts to shift the burden of proof on its fraudulent transfer claim to Defendants. Plaintiff bears the burden of demonstrating all elements of a fraudulent transfer by TransProject to Defendants. *Matter of Galaz*, 850 F.3d 800, 804 (5th Cir. 2017);  *Doyle v. Kontemporary Builders, Inc*., 370 S.W.3d 448, 453 (Tex. App.—Dallas 2012, pet. denied). Defendants have produced documentary evidence of a payment to Violet Rose's counsel in the amount of $369,240.15.  Plaintiff has failed to present any evidence that the "missing" $57,931.10 or any other portion of the turbine sales proceeds were fraudulently transferred from TransProject to the Defendants.  Because Plaintiff has failed to meet its burden to present evidence creating a genuine issue of material fact as to the timeliness or merits of any claim for fraudulent transfer of proceeds from the sale of the turbines in January 2014, Defendants are entitled to summary judgment on this fraudulent transfer claim as well.

### B.    Alter Ego/Piercing the Corporate Veil Liability

Plaintiff claims that Defendants operated (and are continuing to operate) TransProject as their alter ego for their own benefit and therefore should be liable for Plaintiff's TransProject Judgment.

"Generally, alter ego will not apply to disregard the corporate form absent exceptional circumstances."  *Richard Nugent & CAO, Inc. v. Estate of Ellickson*, 543 S.W.3d 243, 266 (Tex. App.—Houston [14th Dist.] 2018, no pet.).[15]  Under Texas law, a

---

[15] "Veil-piercing and 'alter ego' principals apply equally to corporations and LLCs."  *Spring Street Partners-IV v. Lam*, 730 F.3d 427, 443 (5th Cir. 2013); *U.S. KingKing, LLC v. Precision Energy Servs., Inc.*, 555 S.W.3d 200, 213 (Tex. App. —Houston [1st Dist.] 2018, no pet.).  This Court previously recognized that "[i]t is a bedrock principle of Texas corporate law that the corporate structure limits an owner's liability for corporate debts."  ECF 65 at 18 (citations

Plaintiff attempting to impose alter ego liability must demonstrate " (1) that the entity on which it seeks to impose liability is the alter ego of the debtor, and (2) that the corporate fiction was used for an illegitimate purpose, that is, to perpetrate an actual fraud on the plaintiff for the defendant's direct personal benefit." *U.S. KingKing, LLC v. Precision Energy Servs., Inc.*, 555 S.W.3d 200, 213–14 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (citing TEX. BUS. & COM. CODE § 21.223(b)).  Therefore, even if Plaintiff's evidence raised an issue of fact regarding Defendants' status as alter egos of TransProject,[16] Plaintiff must also meet its burden to show a fact issue regarding actual fraud by Defendants. *Id.* at 217. Plaintiff has not met this burden.

Under § 21.223[17] of the Texas Business Organization Act, actual fraud "involves dishonesty of purpose or intent to deceive" and "consideration of whether the entities' use of limited liability was illegitimate." *U.S. KingKing, LLC*, 555 S.W.3d at 217.  At best, Plaintiff's evidence shows that TransProject and Defendants had a contractual relationship and worked together in the ordinary course of their businesses to achieve common goals. The sharing of business functions is a common and legitimate business practice. *See SSP*

---

omitted).  Defendants have never been owners of TransProject, (ECF 70 at 19), but Defendants and TransProject shared common owners.  *See supra* n.2, 3.

[16] In determining alter ego status Courts consider such factors as:  (1) the entities shared common business names, offices, employees, or accounting; (2) one company paid the others' employees; (3) one entity performed services on behalf of the other; (4) one entity made undocumented transfers of funds to the other; (5) there is a clear allocation of profits and losses between the two entities; (6) there was a commingling of funds, or one entity paid the debts of another; (7) one entity represented that it would financially back the other; (8) company profits were diverted from one entity to the other; (9) there was inadequate capitalization on one entity; and (10) there were other failures to keep assets separate. *U.S. KingKing, LLC*, 555 S.W.3d at 214.

[17] Plaintiff's counsel confirmed at the June 26, 2021 hearing that § 21.223 governs its alter ego claim.  Defendants do not concede they are affiliates of TransProject but argue affiliate status does not matter because (i) Plaintiff has no evidence of actual fraud as required by § 21.223; and (ii) § 21.223 is the exclusive basis alter ego liability in Texas. *See TransPecos Banks v. Strobach*, 487 S.W.3d 722, 729 (Tex. App.—El Paso 2016, no pet.) ("The Legislature, however, eliminated the alter ego theory as a basis for disregarding the corporate structure when it adopted what is now Section 21.223 of the Texas Business Organizations Code.").

*Partners v. Gladstrong Invs. (USA) Corp*., 275 S.W.3d 444, 455 (Tex. 2008) ("Creation of affiliated corporations to limit liability while pursuing common goals lies firmly within the law and is commonplace. We have never held corporations liable for each other's obligations merely because of centralized control, mutual purposes, and shared finances. There must also be evidence of abuse . . .."); *Paulsson Geophysical Servs., Inc. v. Sigmar*, No. A-06-CA-952-SS, 2007 WL 9702437, at *3 (W.D. Tex. May 25, 2007) (close contractual relationship through which one entity provided field workers, equipment, and intellectual property to facilitate the contract did not establish one entity controlled the other). Because Plaintiff has failed to meet its summary judgment burden to raise a fact issue regarding actual fraud, Defendants are entitled to summary judgment on the alter ego claim.

### C.    The Conspiracy Claim

The elements of a civil conspiracy claim under Texas law are:  (1) a combination of two or more persons; (2) the persons seek to accomplish an object or course of action; (3) the persons reach a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts are taken in pursuit of the object or course of action; and (5) damages occur as a proximate result. *First United Pentacostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 222 (Tex. 2017).  Civil conspiracy is a theory of derivative liability. *Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 144 (Tex. 2019), *reh'g denied* (Sept. 6, 2019).  Proof of an underlying tort is required to show a civil conspiracy. *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996).  Because the Court recommends dismissal of Plaintiff's fraudulent transfer and alter ego claims against Defendants, it also

recommends granting Defendants' motion for summary judgment on Plaintiff's claim for conspiracy.

## IV. Conclusion and Recommendation

For the reasons set forth above, the Court RECOMMENDS Defendants' Motion for Summary Judgment (ECF 70) be GRANTED and this case be dismissed with prejudice.

The Clerk of the Court shall send copies of the memorandum and recommendation to the respective parties, who will then have fourteen days to file written objections, pursuant to 28 U.S.C. § 636(b)(1)(c).   Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc), superseded by statute on other grounds.

Signed on August 02, 2021, at Houston, Texas.

Christina A. Bryan
United States Magistrate Judge